CASE 31—ACTION BY PLAINTIFF TO RECOVER POSSESSION OF HER CHILD—
MAY 1.

# Stapleton, &c., v. Poynter.

### APPEAL FROM LAUREL CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANTS APPEAL. AFFIRMED.

PARENT AND CHILD—CUSTODY OF CHILD.

Held: 1. While the welfare of a child is to be considered in deter-
mining who is to have its custody, the legal right of the parent
should also have weight; and therefore the widowed mother
of a boy nine years old is entitled to his possession, as against
his paternal grandparents, with whom he has lived for several
years, though they have fortune, character, kindliness, and affec-
tion for the child, and though he prefers to remain with them;
the mother being a person of moral habits, without contagious
or infectious disease, and of enough industry to reasonably in-
sure the child from want.

2 Where a mother, by reason of her coverture, had no power to
contract, her written agreement to give her child to his paternal
grandparents until he should reach his majority was void as
to her, though approved by the father by his written indorsement
thereon, and therefore does not preclude her, after the father's
death, from recovering the child from the grandparents.

H. C. HAZLEWOOD, JAMES SPARKS, E. H. JOHNSON AND J. A.
WILSON, FOR APPELLANTS.

CHAS. R. BROCK, A. W. ALCORN AND D. K. RAWLINGS, FOR APPEL-
LEE.

(No briefs in record.)

OPINION OF THE COURT BY JUDGE O'REAR—AFFIRMING.

This action was instituted by appellee, the mother of
John Craig Stapleton, to recover his possession of appel-
lants, his paternal grandfather and grandmother; the lad
being then about nine years of age. Appellee is a widow.
The father of the boy had died some years previous, leav-
ing no estate, and the widowed mother had none. Appel-

lee, who assumes her maiden name, and W. R. Stapleton were married in 1888, and after a brief and unhappy union, of three or four years, a separation ensued; being, as the record discloses an abandonment of appellee by her husband, who had become dissolute, and who finally lost his life in a drunken brawl.  In this distressing situation, appellee went with her two children, John Craig, and a girl some two years younger, to the home of appellants.  This was before the death of appellee's husband.  She continued there some months, when it was suggested that the old folks could not well accommodate her longer; but they insisted on keeping the children, to whom they appear much attached, especially the boy. Appellee then sought and obtained employment as a domestic, but, desiring the presence of her children, above other considerations, left the place, and took them with her to her father's, in an adjacent county.  Appellant, Edward Stapleton, and the father of the boy, went to her father some two months afterwards, and, under promises of reform, a reunion of the unfortunate couple was agreed upon; the father and grandfather of the boy taking him back to Laurel county, and the wife and the little girl to follow in a few days.  She did so.  But she says that then her husband declined to live with her, and declared his only purpose was to regain possession of the boy.  Appellee returned to her father's, but soon after again sought employment, and obtained a situation in a family at Somerset, where her girl had better advantages for attending school.

When appellee was first abandoned, and was face to face with the proposition of earning her own living, she was induced to sign a contract with appellants concerning her children.  This contract is as follows:

"An article of agreement between Christina Stapleton, of

the first part, and Ed Stapleton and Elizabeth Stapleton, his wife, of the second part: The party of the first part agrees to give her two children, Craig and Della, to the party of the second part, to keep and control as their own until they become 21 years old, unless the party of the first part and her husband should live together again. Then she is to have her children, and not till then. She also gives to the party of the second part all her household goods, and horse and cow, to be used to the benefit of raising said children, and also what W. R. Stapleton, her husband, left in the house of Mr. Gee, which she was to have in provisions to live on; and the party of the second part agrees to try to give said children a common education. This April 30, 1893. Christina Stapleton. Ed Stapleton. Elizabeth Stapleton.

"Att.: Ellen Stapleton.

"I do agree to the above contract.   W. R. Stapleton."

Her husband, some time after, by his indorsement, approved it.

After the death of her husband, the boy now having grown in size, years, and usefulness, and therefore helpfulness, she seeks to recover possession of him, and, indeed, has sought at frequent intervals before this suit to do so, but unsuccessfully until now.

The defense is summed up by counsel for appellants, in their brief, as follows: "(1) The appellants, the grandparents of the child, John Craig Stapleton, are the proper persons to have the care, custody and control of said child, and appellee is not. (2) That they (appellants) are financially able to care for and educate said child in a manner suited to his station in life, and that appellee is not. (3) That said child is possessed of sufficient intelligence and age to judge for himself where he should live, and that it is

the desire of said child to remain with its grandparents, and not with its mother. (4) That on the 30th day of April, 1893, when this child was a mere infant, appellee, by a writing, surrendered the custody of this child to appellants; and afterwards her husband, its father, agreed to the same contract, and signed it. (5) That since said time appellants have had the care, custody, and control of said child, and that during all of said time, up to now, they have cared for and treated said child in a manner highly conducive to its best interests. (6) That it must be a great hardship to appellants and the child, considering the contract and promises made concerning the child, and the attachments that now have grown up between it and appellants during this long time, for it to be taken from them now." All these grounds may well be grouped into three classes: (1) The child's welfare and wishes; (2) the contract of its parents; and (3) the equity of the grandparents, appellants.

The welfare of a child, its life, health, and moral and intellectual being, should be, and are, kept well in view by the courts in determining its legal disposition in litigations over it. This is not upon the ground, sometimes supposed, that courts of equity will overrule the claims of nature, or substitute their discretion as to the child's welfare for the responsibilities imposed by God upon the parent. We apprehend, and, from an examination of the authorities, we gather, this course is justified and applied only in cases where a parent asks the court to change the child's possession, basing his claim upon a legal right,—such, for example, as the legal right of the parent to the custody of his child. Then, and then only, will the court look to the welfare of the child, in withholding its aid; basing its action upon the principle that equity will not do a wrong

to aid a mere naked legal right. By statutory enactment, the Legislatures have provided for the State's taking charge of infants in extreme cases; but nowhere has it been held, so far as we are aware, that a parent, however indigent and ignorant, or even vicious, can be deprived by law of the custody of his child at the suit of a stranger, however opulent, charitably disposed, and prepared he may be to give the child advantage of coveted opportunities for its moral or intellectual development. The day may come when society will demand and exercise some such right. Perhaps it may be recognized in milder form by some in legislation for compulsory attendance at schools. But, in the broad sense suggested, it certainly is not here yet. We hold that when it is shown by the suing claimant parent that he or she is a person of moral habits, of good health (that is, without contagious or infectious disease), and of enough industry to reasonably insure the child from want and positive distress, these conditions, coupled with the parent's legal right, will overcome the supposed advantages accruing to the child by the adverse claimant, a stranger, who merely shows that he possesses fortune, character, kindliness, and affection for the child; and that, too, even though the court might well consider that the opportunities afforded by the stranger are the most favorable for the infant's welfare. The experience in this country is not that wealth, especially when coupled with indulgence, is always most conducive to a useful education and the foundation of the best character. We apprehend that the best part of the child's education will not be obtained at some ideal social institute, though beginning with a kindergarten and ending with a university, but generally at the hearthstone of its family, if that family be a proper one. The welfare of the child is not merely training its head, but includes training

its heart.   Wisdom may be imparted by teaching it to think; the feelings that at last make the man, by teaching it to feel. Orphanage, even partial, is generally conceded to be a misfortune, and universally moves to pity, but it likewise carries a privilege and an opportunity.    The boy who, taught by the stern lessons of necessity and the inscrutable ties of fellow suffering and gratitude to revere his mother, and to help her bear the burdens of widowhood and overcome the adversities of untoward conditions, has accumulated an asset of more value, perhaps, than had his disappointed benefactor been allowed to exploit his plans of education at the sacrifice of filial devotion. "Honor thy father and thy mother" is a command, followed by a promise, of peculiar value in determining the welfare of the child. It is argued, and in some instances has been held, that the wishes or election of the infant will be regarded in determining this question.   Generally those instances where the wishes of a child of sufficient maturity to realize in a measure its situation, have been allowed to control were either in a controversy between parents upon their separation, or where the facts of welfare were so nearly balanced as to leave the court in grave doubt, in which case the wishes of the child were consulted and given some weight.   However, it has not been held anywhere, so far as we have been cited, that the judgment of the infant is to control independent of or despite other circumstances.   We hold that an infant can not dispose of his property of the smallest value, or become bound by contract generally, because of the conclusive presumption that he has not a sufficiently matured judgment to know what his interests are.   We can not, therefore, hold that the determination of a question involving such serious and permanent importance to him as the training of his youth should be at his disposal.

The contract relied upon, in so far as it purports to bind appellee, having been entered into by her while under the legal disability of coverture, was not binding upon her. It was void. We are unable to distinguish it, so far as affecting the *feme covert's* contractual ability, from any other contract relating to her legal or property rights. If the paper ever had any legal value, it was only to the extent of transferring the legal right of the father to the custody of his infants. It could convey, at most, only such right as he held, which, of course, terminated with his death. Thereupon the mother's right of exclusive possession began.

The record discloses that appellants are estimable and worthy old people, who doubtless would bestow on this grandchild every fair opportunity within their power for its material advancement. Their love for it, natural and cultivated, is clearly shown by the circumstances put in evidence. The separation decreed by the circuit court must seem to them, viewed from their standpoint, as a hardship. These facts are argued by their counsel here as presenting an equity entitled to be regarded by the court, in connection with the child's welfare, in decreeing its custody. The utmost the court could be expected to do would be to measure the equities of these contending parties. It requires no judicial determination to properly estimate the mother's love,—probably the strongest instinct of the species. This temporary separation, enforced by conditions beyond her control, instead of weaning her from the child, appears to have intensified her yearning. As between the two—the grandparents and the mother—we do not feel at liberty to change the responsibility of the parent, and the privilege and duty of the child, from where God has placed them. The judgment of the circuit court is therefore affirmed.