## Bedford, by, et al. v. Hamilton, et al.

## Hamilton v. Christian Church Widows and Orphans Home, et al.

(Decided April 25, 1913.)

Appeal from Bourbon Circuit Court.

1. Children—Contract Relinquishing Control of—Adopting as Heir at Law—Writ of Habeas Corpus to Restore Custody—Equitable Action to Have Custody Restored.—Where a father by contract relinquished to a children's home the right to the custody of his child and the home pursuant to its charter rights committed it to the custody of B. who under the provisions of Section 2071, Kentucky Statutes, adopted it as his heir at law, a judgment of the county court, under a habeas corpus proceeding by the father, restoring the child to him, is not conclusive of the rights of the parties in an equitable action by the children's home society to have the custody of the child restored to it, and such judgment is not competent evidence in the action.

2. Habeas Corpus—Judgment in Such Proceeding.—The order or judgment made in a habeas corpus proceeding is not a judgment of a court, or final determination by a court under our practice.

3. Children—Contract Committing Care of to Home—Not Against Public Policy.—It cannot be said that a well conducted institution such as appellee is acting contrary to public policy in making a fair contract with a parent who is not in a position to care for and nurture his child when the contract is for the sole benefit of the child.

4. Children—Contract for Custody of—Right to Custody—Action to Have Custody Restored—Evidence—Judgment of Chancellor.—The evidence showing that the father was not in such circumstances and surroundings as to properly rear and nurture the child, and that the moral surroundings of B. were such as to make his home an undesirable place to again place it, the chancellor properly remanded it to the Christian Church Widows and Orphans Home, a well conducted institution, where the surroundings and influences are pure and wholesome and where the child will be well provided and cared for and given a better opportunity in life than it could be given by its father or by B.

5. Children—Judgment of Adoption—When Error to Cancel.—It was erroneous, however, to adjudge as against the infant a cancellation of the judgment of adoption of the Bourbon Circuit Court wherein the infant acquired the right to inherit from B. as his heir at law, there being nothing in the record to justify the forfeiture of its right to inherit.

TALBOTT & WHITLEY, CHAS. D. WEBB for appellant, Bedford.

JOHN J. WILLIAMS, R. B. HUTCHCRAFT, JR. for Hamilton.

E. M. DICKSON for the Home.

OPINION OF THE COURT BY JUDGE TURNER—Affirming in Part and Reversing in Part.

These appeals involve the right to the custody of the infant appellant, Cary Holton Hamilton, and other questions affecting his welfare.

He was born in Bracken County, Kentucky, in March, 1903, the son of H. H. Hamilton and his wife; when he was about two years old his mother died, and the father having no way to care for an infant of his tender years, and being a shiftless and dissipated man, entered into a contract in October, 1905, with the Christian Church Widows and Orphans Home of Kentucky, whereby he relinquished forever to said Home all rights to the custody and control of the child.

The child remained there until May, 1907, at which time in accordance with the provisions of its charter that institution entered into a contract with the appellant, F. P. Bedford, of Bourbon County, whereby the care, custody and control of the child was committed to his charge, and wherein he covenanted to, and did adopt him as his heir at law, and undertook all the legal and moral duties and responsibilities of a parent toward him, and to faithfully observe and comply therewith. It was further agreed in the contract that the Home might at any time before the child became of age reclaim him for any violation by Bedford of any agreements or covenants in the contract.

In June, 1907, Bedford by a proceeding in the Bourbon Circuit Court adopted the infant as his heir at law under the provisions of section 2071 of the Kentucky Statutes, and judgment was entered in that proceeding adjudging that the infant be clothed with the capacity to inherit from him under the statutes of Descent and Distribution of this State; but to that proceeding the father of the child was not a party, and therefore it was not undertaken therein to adjudge Bedford the parental control of the infant as is provided in section 2072, which section requires the consent of the parents, or either of them, if one be dead, before the parental control shall be adjudged. However, Bedford retained custody and control of the child under his contract with the Home until November, 1911, and in the meantime became very much devoted to him, treated him as his own child, slept with him, took the child over his farm with him and made him his constant companion.

Between 1905 and 1911 Hamilton had married again, and we find him in November of that year a resident with his family of Bourbon County, and at that time he caused to be issued a writ of habeas corpus before the judge of the Bourbon County Court seeking to have restored to him the custody of his infant son. Since the relinquish-

·ment of his child his condition in life had been somewhat improved; he had in some measure abandoned his former habits, and while still in very moderate circumstances, being a renter and owning no property .of his own, he was in better condition than formerly to care for the child.

The county court upon a hearing adjudged Hamilton the custody of the infant and required Bedford to turn the child over to him. Shortly thereafter Bedford instituted this equitable action against Hamilton, the Widows and Orphans Home and the infant wherein he seeks to have restored to him the custody of the infant.

Bedford is a wealthy and influential citizen owning at the time of the adoption and the institution of this suit several hundred acres of fine land, and this record shows him to be beyond question an honorable, upright citizen and a sober and correct business man.

The Home filed an answer wherein it prayed the court ·to restore to it the custody of the infant in the event it should be determined that Bedford was an improper person to rear and train him, or in the event that he had failed in any way to faithfully live up to the covenants in his contract with it. There is a great mass of testimony taken principally upon issues bearing upon the manner of Bedford's living, and his alleged illicit relations for a long series of years with a negro woman who lived at his home; and there is some considerable testimony bearing upon the present and past life and history of Hamilton.

It appears that Bedford in his early manhood had married a prominent young woman of Lexington, and they lived together only for a few months; that he had never re-married and that since that time there had lived with him in his home as his housekeeper, a negro woman, and upon his relations with that woman the most of the testimony bears.

The lower court adjudged that Bedford was not a suitable person to have the custody and control of the infant; that the contract between•Hamilton and the Home was binding, and remanded the custody of the infant to the Home; enjoined it from ever directly or indirectly delivering the infant into the custody of Bedford, cancelled the contract between Bedford and the Home, cancelled and set aside the judgment of adoption procured by Bedford in the Bourbon Circuit Court, and freed Bedford from all responsibility under or by virtue of said

contract or judgment, and deprived the infant of the capacity to inherit from Bedford as his heir at law as provided therein.

From that judgment Bedforl, the infant through his guardian ad litem, and H. H. Hamilton have appealed.

The infant by its guardian ad litem, is asking that the control and custody be committed to Bedford.

The habeas corpus proceeding wherein the county court adjudged the custody of the infant to its father, is relied upon as determining the rights of the parties, Bedford and the Home being parties thereto.

Whatever may be the rule in other jurisdictions, under the express provisions of our Criminal Code, section 428, "The proceedings and judgment upon the writ of habeas corpus shall not conclude or be evidence in any civil suit involving the rights decided by the order or judgment on the writ of habeas corpus." The order or judgment made in such a proceeding is not a judgment of a court, or final determination by a court under our practice. Weddington v. Sloan 15 B. M., 153, Broadwell v. Commonwealth, 98 Ky., 15.

Manifestly, therefore, in this equitable action the judgment and habeas corpus proceeding is not conclusive of the rights of the parties, and is not even competent evidence herein.

It is suggested, but not insisted upon, that the contract between Hamilton and the Home is void as against public policy; but we have been cited to no case in any jurisdiction so holding.

From the very nature of things many of the thousands of infants who are left homeless and friendless by misfortune of various kinds, must of necessity be cared for, reared and trained in such institutions, and it would be a most unwise and unwholesome thing to say that a well conducted institution of this character, after making a fair contract with the parent, for the sole benefit of the infant, was acting contrary to a sound public policy.

It is quite true that such contracts may be cancelled when it appears that it is to the interest of the infant; in truth there is no class of cases where there is a more unlimited discretion given a Chancellor. It is necessarily so, for in no two cases of the many millions of helpless and homeless infants are the circumstances surrounding them the same; as was said in the case of Green v. Campbell, 35 W. Va., 698 (29 Am. State Rep., 843),

"The welfare of the infant is the polar star by which the court is to be guided in the exercise of its discretion."

The American courts almost universally uphold such contracts, especially when they are executed, and the delivery of the custody of the child is made. In 29 Cyc., 1601, it is said:

"Such an agreement will not be enforced to the detriment of the child, but the court will take the child away from the person to whom the parent has surrendered it and restore the custody to the parent, where it clearly appears that such a course will be most beneficial to the child."

In Shouler on Domestic Relations, 245, the rule is thus laid down:

"A fair contract of transfer, on a good and executed consideration, ought not to be set aside and custody restored unless the parent can show that a change will promote the child's welfare."

Long on Domestic Relations, 322, says:

"The weight of American authority is to the effect that such a contract is valid and will be enforced against the parent especially when acted upon, unless the welfare of the child would be better promoted by not enforcing it. * * * All the cases recognize that the welfare of the child is the paramount consideration, and it would seem that whenever the parent's fitness for the trust is established, it might be found, almost as a matter of law, that the welfare of the child would be best promoted by committing it to the care of the parent."

This general policy of the law is expressly declared by statute in this State. Ky. Stats. Sec. 2123.

The opinion in this court in Stapleton v. Poynter, 111 Ky., 264, is not in conflict with these authorities. That case rested altogether upon the fact that the contract between the mother and the grand-parents was void because the mother was at the time of its execution under the disability of coverture.

It appears that the Home before it committed the care and custody of the infant to Bedford made due inquiry of reputable citizens of Bourbon County as to the standing and character of Bedford, and that it acted in good faith in making the contract with him; but it is insistently urged for Hamilton that Bedford has not carried out either the letter or spirit of his undertaking with the Home as to the nurture, training or education of the infant.

Without going into details it is sufficient to say that the evidence discloses that in Bedford's home there was not that refined influence and moral atmosphere which we may expect to find in a home presided over by a pure woman; and we are not prepared to say that the Chancellor did not wisely exercise his discretion as between Bedford and the Home by cancelling the contract, and remanding the custody of the infant to that institution.

The welfare of the child is the paramount question, and the Chancellor will close his eyes to all other considerations, and look alone to the one great, vital thing, viz.: What will bring the best results in the end to the infant? With that sole question in view what do we find?

Hamilton, the father is a poor renter, moving from place to place, year after year, and barely makes both ends meet, in scantily providing for his already sufficient family; he has married a second time, and the infant would be required to live with his stepmother and be under her control; and at the most, he could only hope to become at his maturity a farm hand, or common laborer; and even assuming that the father has fully overcome his former shiftlessness and dissipation, a bright future for the boy would not be in prospect.

On the other hand, Bedford is rich and able to give the boy a good education, and in a material way advance him in the world; but when the child should reach mature years and realize the manner of life which his foster-father had lived, and been deprived in all his youth of the loving care and correct training of a good woman, and reared in the atmosphere of illicit home relations, it could but result, in the usual course of things, in the production of an immoral, hardened man with none of the finer feelings which only the pure atmosphere of a correct home life could bring; unless indeed he be one of sufficiently strong personality and force of character to overcome the effect of such surroundings in his youth which this record does not show him to be.

At the Home he will be surrounded by all the elevating influences of religious training and good home life—not the same to be sure as might be expected in a home presided over by a loving and devoted mother—but as good a substitute for it as has been devised by man. There he will be trained in the ways of righteousness and correct living, and will at least be given a fair education, together with such moral training and material advan-

tages as will give him a reasonable start in the great race of life.

Neither considerations of future wealth, power or influence, nor sentimental considerations of parentage or blood relationship, should be permitted to stand in the way of guaranteeing to an unfortunate and helpless infant the right to be reared and trained in a pure, wholesome and God-fearing atmosphere.

With a view single to the welfare of the infant, giving due weight to all natural and sentimental claims of the father, and proper consideration to the more worldly and material arguments presented in behalf of Bedford, we have concluded that the Chancellor below properly remanded the custody of the infant to the Home.

But there is one thing in the judgment of the lower court which we cannot uphold. It was manifestly erroneous for it to adjudge as against this infant a cancellation of the judgment of adoption of the Bourbon Circuit Court wherein the infant acquired the right to inherit from Bedford as his heir at law. Even if the infant was capable of being guilty of any act which could forfeit this valuable right, there is nothing in the record to justify the forfeiture.

The judgment of adoption is not on the same footing as the contract of adoption made between Bedford and the Home; in that contract the Home expressly reserves the right to cancel it if Bedford failed to comply with his undertakings therein, and in this action the Home has prayed for a cancellation of it if the court should find that Bedford was an improper person to have the care and custody of the child.

The judgment is affirmed upon the appeal of Hamilton, and upon the appeal of Bedford; but for the one reason given is reversed upon the appeal of the infant, with directions to the lower court to enter a judgment in conformity herewith.