### Rallihan, et al. v. Motschmann.

(Decided February 8, 1918.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Infants—Custody.—When both parents are alive, each has a right, equal to the other, to the custody of their minor child, and in the

event of a contest between them as to its custody, the chancellor will award the custody of the child to the parent, in whose custody, the best interests of the child will be subserved.

2. Infants—Custody.—If one of the parents be dead, the survivor, if suited to the trust, has a right superior to any other to have the custody, nurture and control of the child, and the burden of proving the unfitness of the parent for the trust rests upon the one, who seeks to deny him or her, as it may be, the child's custody.

3. Infants—Custody.—Only the surviving parent is authorized, by the statute, to name a custodian for the custody of the person of a minor child, by will, and one parent can not, by will, deprive the other parent of the custody, after the death of the one making the will.

4. Infants—Custody—Right of Parent to.—The right of a parent, if suited to the trust, to the custody of the person of a minor child is superior to that of a statutory guardian, who is other than a parent.

5. Infants—Custody.—The chancellor has the power to prevent a parent from removing a minor child out of the state or out of the jurisdiction of the court, but it is only in extreme cases that the chancellor will assert this power as against a parent, and thus violate the parent's natural and legal right to the custody of the child, and such power will only be invoked, when the best interests of the child will be prejudiced by such a removal.

6. Infants—Custody.—In cases, where the mind of the chancellor is in doubt, as to the proper custody of a minor child, the chancellor may call to his assistance and give weight to the preference of the child, if it is of such maturity as to make an intelligent choice, but where there is no doubt, as to the right of the matter, the chancellor is not compelled to rest his decision upon the immature judgment of a child of tender years, who is in the custody of one of the parties and speaks alone from its present affections, without other reasons for its choice.

7. Infants—Custody—Discretion of Chancellor.—The proper custodian for a minor child is a matter within the sound discretion of the chancellor, after a consideration of all the circumstances and surroundings, and his judgment will not be reversed, unless an abuse of his discretion appears.

8. Evidence—Depositions of Witnesses—Affidavits.—In the absence of an agreement to permit affidavits to be filed and considered as the depositions of witnesses, affidavits can not be read as the depositions of witnesses upon the final hearing of the issues, in an equity action, over the objection of the party against whom they are to be read, although the final relief sought in the action is a perpetual injunction.

BENNETT H. YOUNG, HARDIN H. HERR and MARION W. RIPY for appellants.

RICHARD P. DIETZMAN and WILLIAM P. McDONOUGH for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

This action involves the custody, control and education of Mary Motschmann, an infant now thirteen years of age, and the daughter of the appellee, Robert J. Motschmann, and a granddaughter of the appellants, John Rallihan and Mary Rallihan, who are husband and wife. The appellee and Mary Z. Rallihan, a daughter of the appellants, were married on November 29, 1902, in the city of Louisville, where both were born and reared and where the appellants yet live. Mary Regina Motschmann was the only child of the marriage, having been born on May 4, 1904. After their marriage, the appellee and his wife resided with his mother for one year and then with the appellants, the parents of the wife, for one year; then with another for six or seven months; then with his mother for another year; then with the appellants for about two years, during all of which time, there is no complaint, that he did not support and maintain his wife and child. After this time, he and his wife began housekeeping and continued until they unfortunately became estranged, and separated in the month of May, 1910. Following the separation, the wife instituted a suit for divorce against her husband, but, before a judgment was rendered, an arrangement was effected between them and the suit was dismissed. The record does not disclose the grounds relied upon by the wife in seeking the divorce, nor the terms of the reconciliation, but it seems that they agreed to become reconciled to each other, although it does not appear, that they ever, thereafter, actually lived as husband and wife. About the first of August, 1911, they came to an arrangement with each other, by which it was agreed, that the appellee would leave the city of Louisville and seek his fortune in one of the eastern states, and as soon as he should secure employment sufficiently remunerative to enable him to provide a home for his wife and child, that he would send for them to come to him, which they would do, and thereafter he and his wife and child would reside, together. Appellee went to Buffalo, New York, and after a time to Boston, and then to Providence, Rhode Island, about the beginning of the year, 1913, and has since made his home at that place. Shortly after leaving Louisville, he sent the necessary money to his wife to enable her and the child to come to him, accompanied with the request for her to do so, but for some reason unexplained she declined to go. Thereafter, he requested her to come on two other oc-

casions, upon one of which he sent the necessary funds to pay for tickets for his wife and child to come to where he was, but they never went. After the separation of appellee and his wife, she and the child resided with her parents. It seems, that for a time after leaving Louisville, the appellee gave his wife some assistance in the way of sums of money and clothing, but afterwards he ceased to contribute anything to the support of his wife, probably after her declination to go and live with him; but, he continued to furnish assistance to his child. To what extent does not definitely appear. He regularly paid her tutition at school; sent her presents of various kinds upon holidays and upon other occasions, and, also, sent her sums of money in small amounts from time to time and clothing; took an interest in her progress at school, and after she became ten or eleven years of age, wrote her a number of letters, and as she says, sent her money whenever she would request it. In the early part of the year, 1916, the appellee instituted a suit in the proper court in the state of Rhode Island to secure a divorce from his wife. She resisted the application, and in the month of April, 1916, a judgment was rendered in the action, which appears to have been the result of an understanding between the parties, though the judgment of the court fails to show an agreement of any kind. The judgment divorced the appellee from his wife, but gave the custody of the child to the wife, and, also, directed the appellee to pay to his wife three dollars, per week, for the support of the child, until she should become eighteen years of age, but gave him the privilege of having the custody and association of the child for as much as sixty days in each year, between June 15th and September 15th, in the state of Kentucky, but provided that he should not take her out of the state. While, in his custody, he was to support the child entirely. The ground recited in the judgment for the granting of the divorce was wilful desertion, and it seems that under the laws of that state, when a decree granting a divorce is rendered, it does not become effective until six months have expired, and while the first decree was rendered in April, the one which became final was rendered on October 25, 1916. Thereafter, on October 29th, the appellee married a second time. His first wife, who had been in delicate health for two or three years, died on November 22, 1916. After her death, the appellee, though he discharged

the costs of her burial, ceased to pay the three dollars, per week, for the benefit of the child, and thereafter opened negotiations with the appellants to secure her custody, which they denied him. Since the separation of the appellee and the child's mother, the child had lived with her mother at the home of appellants, and after the death of her mother, had continued so to live. Her grandparents had, during that time, treated her with great tenderness and affection, and had bestowed upon her all the care and attention necessary and suitable to a person of her age, sex and station in life. There is no reason to doubt, that if permitted to have custody of her, that they would continue the same kind treatment and care for her and maintain her to the extent of their ability, as they have heretofore done.

In the month of May, 1917, the appellee, having failed otherwise to secure the custody of his child, sought, by means of a writ of habeas corpus, which he caused to be issued against the appellants to obtain custody of his child, and after a hearing before one of the judges of the circuit court, in Louisville, it was ordered, that she should be delivered to him. This was done, but while he was awaiting a train to return to his home, she was taken from him by an officer, under process from the juvenile court, which seems to have been set in motion by a maternal aunt of the child. He, a second time, had resort to a writ of habeas corpus, but this time against the Board of Children's Guardians, and after another hearing, the custody of the child was awarded to him a second time. In the meantime one of the appellants, John Rallihan, had procured his appointment, by the county court, as statutory guardian of the child. It should, also, be stated that the child's mother, shortly before her death, executed a paper in the nature of a last will and testament, by which she undertook to give the child to her mother, the appellant, Mary Rallihan, and her brothers. After the result of the second writ of habeas corpus, the appellants instituted this action in equity, by which they sought to enjoin the appellee from taking the child into his possession and from removing her from Jefferson county, and from interfering with her in any manner, whatever. The appellee answered and the issues having been joined, a number of depositions and affidavits were taken and filed as evidence and the remainder of the evidence was given orally by the witnesses in the presence

of the court. The oral evidence was, however, written by the stenographic reporter of the court, to whom the case was referred, under an agreement of counsel, to take all of the evidence to be taken in Jefferson county, and to reduce the same to writing and file it with the court as a part of the record of the case. The court, upon final judgment, held that the appellee was entitled to the care, control and custody of the child, and directed that appellants' petition be dismissed, and from that judgment this appeal has been prosecuted.

(a). The only complaint made by appellants of any error made by the trial court, in the admission and exclusion of testimony offered is, that affidavits made by Alice Hendrickson, Margaret Blotscher, Charles Blotscher and Mary Rallihan, and offered as evidence by appellants, upon the final hearing of the case, were excluded, the court, upon objection, refusing to permit the affidavits to be filed or to consider them as evidence. Mary Rallihan is one of the appellants, and she testified orally before the court, both in chief and in rebuttal, and her evidence appears in the report of the stenographic reporter, but, there does not appear any affidavit purporting to be made by her in the record. The bill of exceptions contains the statement, that the affidavit of Mary Rallihan was not an affidavit, but that statements, which she was expected to make, in addition to those made by her which were shown, was an avowal. A detached paper, having no connection with her testimony, as reported by the official stenographic reporter, and purporting to be an avowal of certain statements she would make, appears in the volume containing the testimony reduced to writing by the reporter and heard by the court, but it is not in that portion of it which is certified by the reporter and attested by the judge of the court. There is nothing about this paper, which shows when the avowal was made or which indicates that any objection was made to her making the statement, which it was avowed she would make, or that the court excluded same, neither does the bill of exceptions show that it was objected to or excluded or at what stage of the proceedings it was made. The statements contained in the affidavits of Alice Hendrickson, and Mary Blotscher and Charles Blotscher, so far as they could be considered, as evidence, at all, was evidence in chief, and the affidavits were not offered until appellants had closed, in chief, and the appellee, who was de-

fendant, below, had introduced all of his evidence, and no excuse for the failure to offer the affidavits, at an earlier time, was made; but aside from this, this was a final hearing of an equitable action, and no agreement appears anywhere in the transcript or bill of exceptions to the effect, that affidavits of witnesses might be taken and read as their depositions, and in the absence of such an agreement, affidavits could not be used for that purpose, and thus to take the place of depositions taken upon notice and after an opportunity for cross-examination. Certain affidavits were read and considered as evidence, but no objection was made to their introduction, but the fact, that a party might be willing to allow certain affidavits to be read as evidence against him, would not preclude him from objecting to the introduction of others. Subsection 2, of section 552, of the Civil Code, provides, that the proof upon any issue of fact, which arises upon the pleadings, in an equitable action, except in quarterly, police, county or justices' courts must be made by depositions or exhibits, unless the issue is transferred pursuant to title II., of the Civil Code, to the ordinary side of the docket, when the court may, in its discretion, require the testimony to be given orally, and provided, also, that the genuineness of the exhibits, which are offered in evidence, may be proven orally as theretofore provided by law. Section 277, of the Civil Code, which authorizes the reading of affidavits upon an application for an injunction, has reference to a temporary injunction, or one granted before final judgment in the case, and does not have application to the proof upon the issues in an equitable action, although a perpetual injunction is sought as the final relief in an action, and which must be granted or refused as the final judgment in the case. May v. Williams, 109 Ky. 682. If it should be insisted, that there existed a tacit agreement, that affidavits of witnesses might be used as their depositions, the appellants are confronted by section 585, of the Civil Code, which provides, that "No deposition shall be read on a trial, unless before the commencement thereof it be filed with the papers of the case." The reason for this code provision is self evident, in that, it is a safeguard against one litigant taking another by surprise. Hence, if the statements, contained in these affidavits, were incorporated in depositions regularly taken, with an opportunity for cross-examination, but, not having been filed before the com-

mencement of the action, they would necessarily be excluded. Hence, the affidavits excluded could not properly be considered by the court as evidence over the objection of appellee, and can not now be considered as evidence upon this appeal.

(b). According to the doctrine of the ancient common law, the father was entitled to the custody of his infant child, and this right prevailed against the claims of all others, with little regard to his suitability to the trust. The rigor of this rule was, however, in the course of time, much softened and one adopted more in keeping with common sense and the dictates of common humanity. The doctrine, as adhered to in this jurisdiction, has maintained, as a general rule, that the father has a superior right to the custody of his infant child against the claims of all others, including those of the mother, but was modified to the extent, that in a contest between the father and another, in whose custody the child was and who had some claim to its custody founded in relationship to the child or the affections of the party or from having cared for the child, when it was abandoned by the father, or from some other reason, which would equitably estop the father to seek its custody, the court would investigate all the circumstances, and, if the father was unfit to have the custody of the child and the awarding of it to him would prejudice its interests, its custody would be awarded to the other, if fit for the trust. Even where the parents were divorced the father was held to have a superior right to the custody of their infant child, as against the mother, but, with the modification, that the court would confide its custody to the parent most worthy and capable of the trust. The good of the child was the leading consideration in its disposal, and if it appeared, that, the interests and welfare of the child were best subserved by confiding its custody to its mother, it was so confided. The father owed both a moral and legal obligation to the child to nurture and maintain it, and this added to the fact, that, in most instances, he would be more able in a material way to provide for it was doubtless the foundation for the rule, which held that he had a superior right to its custody. Adams v. Adams, 1 Duvall 169; McBride v. McBride, 1 Bush 15; Ellis v. Jessup, 11 Bush 403; Bonney v. Bonney, 8 R. 774; Proctor v. Rhoads, 4 R. 453; Burke v. Crutcher, 4 R. 251; Smith v. Martin, 4 R. 734; Stapleton v. Poynter, 111 Ky. 264; Barlow v. Barlow, 20

R. 664; Fletcher v. Fletcher, 21 R. 1302; Irwin v. Irwin, 105 Ky. 632; Goodridge v. Goodridge, 25 R. 649; Masterson v. Masterson, 24 R. 1352; Crabtree v. Crabtree, 27 R. 435; Hoskins v. Hoskins, 28 R. 435; Railey v. Railey, 23 R. 1891. Section 2033, Kentucky Statutes, is as follows:

"The father of the minor, if living, or if dead, the mother, if suited to the trust, shall be allowed by the court to have the custody, nurture and education of the ward."

And by section 2016, Kentucky Statutes, 1909, the father was authorized by will to appoint a guardian to his infant child during its minority, and, also, to appoint the guardianship of the infant's estate to one and its custody to another. These sections were, however, amended in 1910 by section 2016, Kentucky Statutes, 1915, which is as follows:

"That the father and mother shall have the joint custody, nurture and education of their infant child, or children, and in the event of the death of either one of the parents, father or mother, the survivor, if suited to the trust shall have the custody, nurture and education of such infant child or children, and may, by will, appoint (a) guardian to his or her infant child or children during its minority or for any less period, and may appoint the guardianship of the infant's estate to one and the custody, nurture and education of the infant to another, but the father shall be primarily liable for the nurture and education of his infant child or children." It will be observed, that by this amendment, the father and mother are put upon an equality as to the right to the custody of their infant child, and, also, upon an equality in the right to the custody in the event of the death of either, and the right to name, by will, a guardian for the infant. Hence, it appears that in the event of the death of a mother, the husband surviving, as in the instant case, he has a superior right, both under the common law and by the statute, if he is suited to the trust, to have the custody, nurture and education of his child. This right seems to appertain to him, both in accordance with the common law of this jurisdiction and by the terms of the statute, above quoted. As between the appellee and the mother of the child, his right to the custody was not superior to the right of the mother, and in that state of case, as between him and the mother, in the event of a separation, the court, in confiding its custody, would be guided alone

by the best interests of the child, in accordance with the doctrine announced by this court before the enactment of the statute, *supra;* but, when the mother died, the father's right, to the custody, became superior to any other person, if he was suited for the trust. In determining his suitability the court will take into consideration his moral fitness and habits, surroundings, age, financial ability, interest and affection for the child, and any circumstances, which would be prejudicial to the best interests of the child, including the breaking up of her present relations, but the burden of showing the father's want of suitability is cast upon the one, who would deny him the custody of his child upon that ground. The proof shows that during his entire life he has continued in moral courses. This was proved abundantly by old associates and acquaintances, in the city of Louisville, where he was reared, and it is just as emphatically shown by his associates and acquaintances, who constitute men of several different walks of life, in his new home in Providence. There is nothing to indicate, that his present wife is other than a fit companion for his daughter. He resides in a respectable neighborhood, in a well furnished house for one in his station in life, and that he has an income from his wages and pension of about $1,400.00, per year. The witnesses describe him as living an industrious, clean and sober life, and enjoys the respect of those with whom he associates. He is twenty years the junior of the appellant, John Rallihan, and enjoys an income of more than twice as much per month. It is his duty to support and maintain his child, and there appears no reason why the court should violate the inherent right of a parent to have the society of his child by denying her custody to him.

(c). It is insisted, that the fact that the father remained in Providence and did not visit the child for a period of five or six years, is such conduct, as forfeits his legal right to now have her custody. This, however, is not tenable, because he did not desert or abandon his child, but went away with the expectation, that, she and its mother would come to him to live. The estrangement between him and the mother became more pronounced, because of her refusal to go to him, and it is not unreasonable, that a visit from him would have been productive of unhappiness to the child rather than pleasure on account of the presence of both parents, in estranged relations, and that the wife, having a right to the child's

custody of the same dignity with his right, the fact that he did not undertake earlier to secure her custody arose probably from a feeling of consideration for the child which was more commendable than otherwise especially, when she was in the custody of her mother, whom no one insists was not fitted to care for her child. These facts could only be urged as evidence of want of affection on his part for the child, which would now make him unsuitable for her custody, but other facts and circumstances in the case show this contention to be unfounded.

(d). It is contended that John Rallihan, as the statutory guardian of the child, is entitled to her custody, but the right of a statutory guardian to the custody of the person of an infant is inferior to that of a parent, who is suitable for the trust. Section 2016, Kentucky Statutes; Mason v. Williams, 165 Ky. 331.

(e). The attempt by the child's mother to give her custody, by will, to her mother and brothers, does not constitute any right to her custody, as against the surviving father, because it is only the surviving parent, who is authorized by will to name a guardian for the custody of an infant or for his estate, and to hold that one parent could give away by will the custody of a child, as against another parent, would be in direct conflict with section 2016, Kentucky Statutes, *supra.* Mason v. Williams, *supra;* Stapleton v. Poynter, *supra.*

(f). The argument, that the awarding of the custody of the child to its father would be, in effect, a court of equity permitting a child to be taken out of its jurisdiction, and that such should not be done, is without any foundation in any good reason. It is true, a court of equity has power to restrain the improper removal of a child from the state, even by a parent, but a case, which would justify interference of that kind with the natural and legal rights of the parent would have to be a very extreme one indeed. 14 R. C. L. 273. The facts of this case show no ground to justify such an exercise of the power by the chancellor. This question arose in the old case of Adams v. Adams, *supra.* In that case the mother resided in the state of Ohio, and the court awarded her the custody of the child and said:

"The residence of the mother in Ohio presents no formidable objection to the order. For the welfare of the infant the court might change the domicile. . . ."

(g). It is further insisted, that in the instant case,

the court having examined the child and inquired, with reference to her preference of remaining with her grandparents or her custody being awarded to her father, expressed the preference of remaining with her grandparents, the appellants, and for this reason the court should not have, contrary to her desires, awarded her custody to her parent, and in support of this is cited the case of Ellis v. Jessup, *supra,* and a number of others. It is further insisted, that she is of such mature age and judgment as to be capable of making a proper choice, and that it should have had a controlling influence upon the judgment. The court, in the present instance, however, was of the opinion that she was not competent to make an intelligent choice. While the reason assigned by the court for that conclusion does not appeal strongly to us, we do not understand, that under circumstances of this kind the court is compelled to rely upon the choice of the child, although it is of ordinary intelligence for children of that age, but that, it is only where the court is in great doubt, as to what should be done in the premises, that the preference of the child is given weight. The decision of cases of this kind are difficult, because of the affections of the claimants and child oftentimes run contrary to the best interests of the child. The controversies are fierce and filled with accusations pro and con. The fault of a family quarrel is thus involved in mystery and can not be satisfactorily located. When the chancellor is in doubt, as to the right of the matter, and, there is an absence of unerring guideposts to the proper judgment, and the child is of such intelligence and judgment as to be capable of making an intelligent choice, the chancellor may call to his aid the preference of the child, as to its custodian, but, where there is no doubt of the proper judgment, there is no necessity to rest the decision upon the immature judgment of an infant of tender years, who is in the custody of some of the parties and speaks alone from its present affections. The laws of God, as well as of man, have made the parent the natural protector and guardian of his children, and the natural family relation should be favored in fixing its custody, if the parent is fit for the trust. The judgment of the chancellor, as to the proper custody of the child is a matter within his sound discretion, and his judgment will not be reversed, unless there is an abuse of his discretion.

The judgment is affirmed.