## Smart's Executrix, et al. v. Bree, et al.

(Decided November 20, 1925.)

### Appeal from Kenton Circuit Court.

1. Parent and Child—Court May Make Different Disposition of Children than to Parents or Guardians, if their Best Interests and Welfare Demand Such Disposition.—Though legal rights of parents or guardians will be enforced if real and permanent interest of child does not demand different disposition, where interest of child demands different disposition court should not hesitate; guiding principle being welfare and best interests of the child.

2. Parent and Child—Under Evidence, Held, that Best Interest of Children Required Granting their Custody to Aunt and Uncle, Rather than to Testamentary Guardian.—Where both parents were deceased, held, that evidence showed real and permanent interest of children required that they be left with aunt and uncle, rather than testamentary guardian appointed in deceased mother's will.

JOHN L. LUNSFORD for appellant.

R. G. WILLIAMS for appellees.

Opinion of the Court by Judge Dietzman—Affirming.

In 1914, Augusta Tucker and John William Smart were married. Of this union three children were born, the custody of the two oldest of which is the cause of this controversy. This young couple had not been married long before the dreaded scourge of tuberculosis entered their home and soon attacked both of them. They had only their labor for their support and when their strength failed them, poverty came to add its crushing load upon them. The family of William Smart was very good to these unfortunate people and aided them with food, clothes, medical services, some money and in many other ways. Finally, however, the struggle to keep house became too great and in July, 1922, Augusta Smart was taken to Spears Memorial Hospital in Dayton, Kentucky, where she remained until she died pending this appeal. The two older children, Genoa and Virginia, then about seven and four years old, respectively, were placed in the Campbell County Protestant Orphans' Home in Clifton, Kentucky. They were not happy there and after some three months, they were taken out into the country to live with a paternal uncle, James Smart. The father was not satisfied with the surroundings at his brother's home. After some time, he prevailed upon his sister, the appellee, Mary Bree, to take these children, and this she did in November, 1922. In February, 1923, the father died. The mother, however, made no effort to take the children away from the Brees until September, 1923, when she made such an attempt through a *habeas corpus* proceeding which, after a full hearing, was dismissed on October 2, 1923. In March, 1924, she filed this equity suit, the prayer of which asked that she be given the possession of these children, although in the proof she frankly confessed her inability, due to her illness, to take actual possession or personal custody of them, but expressed her determination either to give such possession and custody to Mrs. Louise Newcamp, her first cousin, or to entrust the same to the orphans' home in which the children had been placed when she had broken up housekeeping. On final hearing, the trial court dismissed her petition and from that judgment she appealed. Pending this appeal, she too has died. By her will she directed that the custody of these children be given to Mrs. Newcamp or in default of the acceptance of such trust by her

to some Protestant orphans' home.  She appointed Mrs.
Newcamp testamentary guardian of the infants and ex-
ecutrix of her will, and this appeal has been revived in
the name of such guardian and executrix.

The evidence most satisfactorily establishes that
these children are happy and well taken care of in the
home of the Brees.  The latter are not rich but they own
a little cottage in the country near De Coursey in Kenton
county, with a plot of ground of some two acres sur-
rounding it.  Both of them are in the fifties.  Their own
children, a boy and girl, are grown.  Mrs. Bree is a good
housekeeper.  Mr. Bree is a carpenter and is shown to
be a hard working and industrious man.  The children
are well fed, neatly dressed, clean, healthy and best of all
the recipients of that love and affection without which a
child's life is empty and void.  It is true the school is
some distance away and in bad weather Genoa has prob-
ably not attended as regularly as she should, yet on the
whole, she is making satisfactory progress.  The school
is ample for her present needs and gives promise of im-
provement.  That the children love the Brees is also well
proved.  No one could read the testimony of Fred Bree
without being favorably struck and touched by the evi-
dence of the mutual love existing between him and these
children.  Speaking of Virginia, he answered the ques-
tion if he loved her, thus: "I love the child and believe
the child loves me or she wouldn't act as she does."

Q.  "What evidence have you of that fact?"  A.
"I don't know, I just got that feeling, I reckon."

Q.  "Do the children ever display any love or
make any display of their affection?"  A.  "She will
run to meet me and kiss and hug me."

Q.  "Then what do you do when she does that?"
A.  "I usually take her hand or pick her up and carry
her the biggest part of the way home."  In the words of
the Scottish bard:

"Th' expectant wee things, toddlin', stacher through
To meet their dad, wi' flichterin' noise and glee.
            .   .   .   .   .
The lisping infant prattling on his knee,
Does a' his weary carking cares beguile,
And makes him quite forget his labor and his toil."

While it is also shown that Mrs. Newcamp is willing
to take these children and is an estimable woman, yet,
like the Brees, she too lives in modest circumstances.

She is a widow and is dependent upon her own children, who are rapidly approaching their majority and who may marry and leave her home at most any time. She has never had these children and of course there is not that tie of affection between them and her which exists between them and the Brees. The Brees, according to their station of life, which is equal to that of Mrs. New-camp, can and have expressed a willingness and desire to do as good a part by these children as Mrs. Newcamp can do.

In Strangway v. Allen, 194 Ky. 681, 240 S. W. 384, this court, reviewing the cases which preceded it relative to the custody of infants, and especially those of Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358, and Stapleton v. Poynter, 111 Ky. 264, 62 S. W. 730, relied on by appellant herein, said:

"The equity courts of general jurisdiction have held from the time when it first dawned upon the civilization of our race that a child was not absolutely a mere chattel of the parents to do with as they chose, jurisdiction of both the property and custody of the persons of infants, and have as custodians of the interest of society in its members exercised a supervision over the care, custody and training of infant children. . . . While the best welfare of the child is the star which should guide all courts in determining the custody and control of it, there are certain legal and equitable rights which private persons have to the custody of a minor child, and which pertain particularly to such persons. These rights, however, may be forfeited by their possessors, and may be subordinated to the welfare of the child, and are always under judicial control. To illustrate, among the legal rights to a child's custody is the right of a parent or guardian for the custody of a child, and such rights will be enforced if the real and permanent interest of the child does not demand a different disposition. . . . It is not held, however, to be conducive to the best interests of the child to take it from its parent and give it to a stranger when the parent is of a good character, and can and will reasonably, according to his station in life, give to the child a sufficient maintenance, support, moral training, and education, and from such a parent a child will not be taken, although, in the opinions of

those who have formed such from the effusions of visionary theorists, and persons without children of their own, leaving the child with such parent does not subserve its best interests.

"There may be conflicting legal rights of different persons to the custody of a child. There are equitable rights which persons may possess to a child's custody as having acted *in loco parentis* to the child when its natural protectors have deserted or abandoned it, and performed the obligations which a parent should perform, or where a child has been put into the custody of another by one who has the legal right to its custody, and it has remained until the affections of the child for its custodians and surroundings have become such as that a separation would seriously affect the best interests and happiness of the child, and the one having legal right to its custody is unfit or unsuited therefor. Ellis v. Jesup (11 Bush 403); Bedford v. Hamilton (153 Ky. 429, 155 S. W. 1128). Under such circumstances it is considered that the right of the custodian is superior to that of the one having in the first instance parted with the custody. The moral obligations of near relatives, other than parents or legal guardians, to provide for and maintain minor children, helpless because of infancy or other reasons, and who have performed such services for the minor children, have often been held to give them a superior right to the custody of a child to one having a legal right to its custody, but who has been derelict in his obligations to it, or is not fit by reason of depraved habits, or other good reason, to have its custody."

Thus we see that the guiding principle in these cases concerning the custody of infants is the protection of the welfare and best interests of such children. Although, as said in the Strangway case, *supra,* the legal right of the parent or guardian to the custody of the child will be enforced if the real and permanent interest of the child does not demand a different disposition, yet where the real and permanent interest of the child does demand a different disposition, the court should not hesitate to make such different disposition.

Such is the case here. We are now, by reason of Divine Providence, not called upon to determine the conflicting claims of the mother of these children and of

their custodians. As between the testamentary guardian and such custodians, the evidence overwhelmingly discloses that it is to the real and permanent interests of these children that they be left with their aunt and uncle. This being so, it is our duty to leave them there. As the judgment of the lower court comports with this conclusion, it is affirmed.