# Cummins v. Bird.

(Decided May 14, 1929.)

O. M. ROGERS and J. C. ROGERS for appellant.

J. T. MURPHY and S. L. BLAKELY for appellee.

OPINION OF THE COURT BY JUDGE WILLIS—Reversing.

The controversy in this case is between the father and maternal grandfather of Eleanor Flo Bird and concerns her custody. The circuit court decided in favor of the father, and the grandfather appeals.

Elmer F. Bird, on February 3, 1916, married Florence Cummins, a daughter of the appellant, L. G. Cummins. Eleanor Flo Bird is their child, and on November 20, 1928, was 12 years old. Before the baby was a year old, Mrs. Bird obtained a divorce from her husband on the ground of cruel and inhuman treatment. She was awarded the custody of the infant, and, by an agreed order, the father was directed to pay $5 per month toward its support. The mother and child went to the home of the appellant, where they remained until March, 1921, when Mrs. Bird remarried. The appellee paid the monthly allowance of $5 for the first 2 or 3 years, but since then has done nothing for the child or contributed anything to its support. Although living near, he made no effort to see his baby or to cultivate her affection.

Until litigation arose concerning her custody, she did not know him at sight. He did not so much as remember her on her birthdays or send her a present at Christmas. For a full decade he was utterly indifferent toward her and completely ignored her existence. His explanation is that his estrangement from the mother and her family led him to believe that efforts on his part to cultivate the love of the child might cause trouble or unpleasantness, and he refrained from so doing and suppressed his own desire to see and serve her out of consideration for the welfare of the child.

In March, 1927, the mother died and the little girl returned to the home of her grandparents. During the 6 years following her mother's remarriage the little girl was nominally with her mother, but actually spent much of her time with her grandparents, who have a daughter, Laura Neil, about the age of Eleanor Flo. The two little girls have grown up together, are devoted to each other, and have been intimate and constant companions. They go together to church and school and room together at home. The grandparents show no partiality between them, but provide alike for each, liberally according to their means. After the death of the child's mother, appellee set about to gain control of her. His efforts in that direction were unsuccessful, and he instituted against appellant this action in equity to vindicate his legal right to the custody and control of his child. He rests his claim upon section 2016, Kentucky Statutes, which provides "that the father and mother shall have the joint custody, nurture and education of their infant child, or children, and in the event of the death of either one of the parents, father or mother, the survivor, if suited to the trust, shall have the custody, nurture and education of such infant child or children."

It is insisted that Mr. Bird is suited to the trust, and, since he is her sole surviving parent, that he is entitled to the custody and control of his child. Mason v. Williams, 165 Ky. 331, 176 S. W. 1171; Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358; Walker v. Crockett, 194 Ky. 531, 240 S. W. 35; Scott v. Kirkpatrick, 205 Ky. 700, 266 S. W. 390; Hampton v. Alcorn, 213 Ky. 599, 281 S. W. 540; Baker v. Coleman (Ky.) 16 S. W. (2d)——, decided May 7, 1929. It will be seen that the statute does not confer upon the parent an absolute right, but conditions the custody of infant children upon the suitability

of the particular parent to the discharge of the duties of the trust. The welfare of the child, consistently with legal responsibilities, is the controlling consideration in determining its custody, or the suitability of a claimant for the trust. Bedford v. Hamilton, 153 Ky. 429, 155 S. W. 1128. The term "suited to the trust," as used in the statute, is an elastic one, and it must be understood and applied in the light of the facts and circumstances of each particular case. It involves a consideration of every element entering into the problem, and a contemplation of all the factors that may affect the welfare and happiness of the infant whose interests are involved. Moore v. Smith, 228 Ky. 286, 14 S. W. (2d) 1072. The judicial inquiry is not confined or limited to the moral character and financial ability of the particular parent that may be asserting a right to the custody of his child. It comprehends a proper consideration of those essential elements of the problem, but, in addition thereto, it requires due weight to be given to all other facts and factors that' have a bearing on the complex and responsible duty of rearing, training, and fostering a child according to its potential capacity and consistently with its individual character and needs.

It is shown in this case that the child has a good home in a rural community where she is provided with every safeguard, convenience, and opportunity. The religious and educational advantages are ample, and the child has been given the full benefit of both. Appellant and his wife are people of excellent character, devoted to the child, capable of doing and willingly performing for her welfare all that could be suggested or desired. The child is happily situated, and the companionship afforded by her aunt, of practically the same age, introduces into the case an important and irreplaceable factor. Cf. Shelton v. Hensley, 221 Ky. 812, 299 S. W. 979, and Hampton v. Alcorn, 213 Ky. 599, 281 S. W. 540. One proposing to disturb a situation so satisfactory assumes a heavy burden, and must manifest a clear and undoubted right. We are not impressed with the suggestion of the chancellor that any weight is due the testimony of an unfriendly witness, to the effect that the child's grandmother once showed coldness or indifference toward her own father when in distress. That testimony was fragmentary and lacking in verisimilitude. Mrs. Cummins was not a party to this suit, and, since she could not testify for her husband, no opportunity for denial or ex-

planation of the testimony was presented. The circumstance referred to happened many years ago, and its occasion, or setting, which may have shed a different light upon it, was not explained. The record shows that several years ago the appellee himself was so forgetful of his duty and character as to mistreat his wife and infant child, but we are asked for him to make allowance for the improving influence of time, and to recognize the rule that one should not be condemned forever for a single serious lapse. The law looks with favor upon reformation, and proof of present good character and conduct is admissible in cases of this type. Hampton v. Alcorn, 213 Ky. 599, 281 S. W. 540, Moore v. Smith, 228 Ky. 286, 14 S. W. (2d) 1072. The rule of reparation by time, coupled with good conduct, invoked on behalf of the appellee, applies with equal force for the benefit of Mrs. Cummins, even if she had once been forgetful of her father. But the loyalty and devotion shown by Mrs. Cummins to her deserted daughter while she was living, and to that daughter's helpless child after its mother was gone, is satisfactory evidence that her sense of obligation is not deficient, and is conclusive that the testimony against her was unworthy of any weight in the disposition of this case.

It is said that Mr. Bird is a man of good character and able to support his child. He served his country faithfully in war and received an honorable discharge from the army, which certifies to the uniform excellence of his character and conduct as a soldier. He has a permanent and responsible position with one of the great railway systems of the country, with years of service to his credit. His wages are substantial, and he is able to bear the expense of completing the rearing and education of his child. His acquaintances, neighbors, and fellow workmen bear cheerful testimony to his punctuality in the performance of his various obligations and to his good standing in the community where he lives. The chancellor construed the statute to mean that the right of a surviving parent was absolute, unless unsuited to the trust by reason of some moral defect or kindred delinquency. As Mr. Bird's morals and habits were not assailed, the circuit court thought he was entitled to the custody of his child. It is obvious, however, that a man may be of good character and financially secure, and yet not suited to the trust of rearing and educating a 12 year

old girl, with whom he has had no previous acquaintance or contact, even though it be his own child.

There are other considerations and circumstances to be weighed. The appellant urges that Mr. Bird's right to claim the custody of his child was forfeited, and his unsuitability for the trust demonstrated, by his failure for years to do anything for the child or to evince any interest in her welfare. 29 Cyc. 1586; 20 R. C. L. 599; Strangway v. Allen, 194 Ky. 681, 240 S. W. 384. It must be admitted that the conduct of appellee toward his child for 12 years is very difficult to reconcile with his present protestations of fatherly interest and affection, and his explanation of the reasons that actuated him is not entirely satisfactory. It is difficult to understand how manifestations of affection for his child and exertions for her welfare could have injured her father in the estimation of his former wife's people, or could have produced unpleasantness for the child.

It is also urged that the present situation of the girl is so happy and wholesome, and so conducive to her permanent welfare, that the experiment of a change should not be undertaken even to satisfy the demands of her father. The breaking up of established relationships of a type beneficial to the child is a factor to be considered in determining the suitability of a claimant to the custody of the child. In Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358, the rule was announced that "in determining his suitability the court will take into consideration his moral fitness and habits, surroundings, age, financial ability, interest, and affection for the child, and any circumstances, which would be prejudicial to the best interests of the child including the breaking up of her present relations." Cf. Smart v. Bree, 211 Ky. 335, 277 S. W. 478.

Eleanor Flo Bird is a bright, normal, and happy child. She testified frankly and intelligently and expressed an ardent desire to remain in her present home with her grandparents. When asked about her attitude upon that subject, she said it was her wish to live with her grandparents and Laura Nell (her aunt of about the same age). In answer to the question, "How would you feel if they should take you away?" she expressed the depth of her feeling in these words, "I feel I would just die the minute the word was said." The determination of that question, of course, is not for the child, but, upon the issue of her custody, the wishes of an intelligent

girl 12 years old are entitled to respect, and in case of doubt, or where the considerations affecting a decision may be in equipoise, her desire in the matter may be decisive. 20 R. C. L. 599. Ellis v. Jessup, 11 Bush, 403; Stapleton v. Poynter, 111 Ky. 264, 62 S. W. 730, 23 Ky. Law Rep. 76, 53 L. R. A. 784, 98 Am. St. Rep. 411; Shallcross v. Shallcross, 135 Ky. 418, 122 S. W. 223; Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358; Burton v. Burton, 184 Ky. 268, 211 S. W. 869.

The appellee has no property or home of his own. He has made little or no provision for the future. He lives with his parents and proposes to take his child there. His father, mother, and sister, with whom he lives, each express a willingness for the child to be brought there; but their conduct heretofore has not been such as to manifest any interest in the child. Cf. Smart v. Bree, 211 Ky. 337, 277 S. W. 478. Bird's right to remain with his parents may never be questioned, but yet it is subject to their will. They would be under no obligation to keep him or his child. They are both well advanced in years and their children are all grown. They are good people, and doubtless would do the best they could for the little girl; but it is altogether unlikely that they could afford the child such training and care as it is receiving, or win her confidence and love to the extent her maternal grandparents already have done by a decade of devotion. Mr. Bird is not at home much of the time. He is a locomotive engineer, and the nature of his employment takes him out of the city almost daily. He is unmarried, and his future domestic relations are unsettled and uncertain. He is not prepared to provide the child with the home, the surroundings, the companionship, or the training she now enjoys. Her welfare would not be enhanced, but well might be endangered, by disturbing her present happy relations with those who have loved and cared for her from infancy, and who possess her confidence and affection.

A girl at the age of 12 is fortunate to have the care and counsel of a good woman, whose control of and contact with the girl have been of such duration as to establish mutual confidence; and, no matter how willing and worthy a new custodian might be, it necessarily would require time to overcome the diffidence or aversion that would be natural at the inception of a new relationship, and to establish anew the conditions conducive to the welfare of the girl. The problems of parentage are

never more serious or important than at this period in the life of a girl. It is not a good time to introduce a radical, unwelcome, and undesired change in her situation when that existing. is satisfactory. No reason is apparent why the appellee should not first endeavor to win the affection and esteem of his child by manifesting his worthiness and willingness to do a father's part. His opportunity in that regard will not be lessened or restricted by the child remaining where she is. Indeed, it might be enlarged, with the irritating question of a change in her custody eliminated. If the father would consider and discharge his duties toward the child awhile before demanding a supposed right to her custody, his problem might be simplified, or disappear entirely. We doubt not that proper efforts on the father's part to gain the girl's admiration, affection, and gratitude, assisted by the natural ties of blood, would be richly rewarded. What has been lost by neglect, aloofness, and indifference might readily be reclaimed by fatherly interest, kindness, and affection.

Great responsibilities and duties must be met and performed by the courts, and none of them are more delicate or difficult than the determination of questions respecting the custody of children. The ties of blood and the claims of love often struggle for supremacy. When the welfare of the child and legal rights are clear, the duty of the court is plain. But what may be best for the welfare of the child is often difficult to determine, involving, not only a consideration of present facts, but in a large measure, a prophecy of future circumstances. The child's vital interest may be affected by a decision changing its status, thus admonishing a court that caution in such cases should govern its steps. The promptings of parental love should reconcile the father to the undoubted wisdom of maintaining the present happy situation of his child. Gratitude to her benefactors should impel him to help rather than to harass them in sustaining the obligations they have voluntarily assumed, and we venture to suggest that he will find more happiness in serving the interests of the child where she is than could be realized by wresting her from the only home she has ever known. Appellee may realize his own flagrant failure of duty toward the child in the past, and wish, after securing her custody, to make reparation by kindness; but atonement for the dereliction is more likely to be found in efforts to

promote the comfort and happiness of the child than by inflicting upon her another tragic experience.

The duty of denying to a father the custody of his child is a serious and solemn one, but when the father for years has relegated to others his duties and responsibilities respecting the child, and when those others, actuated by love and affected by the ties of kindred, have accepted the responsibilities and performed the duties thus thrust upon them, their rights are not to be ignored, but should be preserved, unless the change proposed is consistent with the legal rights and would benefit the child, which is always the peculiar care of the court. This record not only fails to show that the child's welfare would be promoted by a change in her custody, but makes it clear beyond cavil that her supreme good will be subserved, and the legal rights of the litigants preserved, by permitting the existing situation of the child to remain undisturbed.

The considerations suggested constrain us to the conclusion that the chancellor erred in this case in adjudging a change in the control and custody of the little girl.

The judgment is reversed, with directions to dismiss the petition.