Dixon, J.
This is a proceeding in habeas corpus, brought by the relator Harry L. Lutkehaus, to recover the custody of his child Robert Lutkehaus, a minor seven years of age, who, the relator claims, is being unlawfully deprived of his liberty by one Evelyn V. Stroud, who is the child’s material grandmother.
From the pleadings and evidence it appers that the relator and Olive Stroud, the' daughter of the respondent, were married on *121 April 29, 1911, and from this union the child Robert whose custody is now in controversy, was born on March 9, 1912.
Immediately upon their marriage, relator and his wife, who were both quite young at the time, took up their abode in the home of the respondent, the wife’s mother, pursuant to an arrangement made between respondent and relator as to the payment of the living expenses of the home.
For some reason, which does not satisfactorily appear from the evidence, the married life of Lutkehaus and his wife was far from happy, and as a result of this domestic infelicity, Lutkehaus left his home about two years after his marriage, and never afterwards lived with his wife. This action on the part of the relator caused his wife, in March, 1914, to apply for a divorce from the relator, in the insolvency court of Hamilton county, Ohio, on the ground of gross neglect of duty. In November of the same year the court granted the wife a decree, the husband not appearing in court, and also gave the wife the exclusive custody of the child Robert, and ordered the respondent to pay, in addition to a lum sum for past support, the sum of $4.00 per week for the future support of the child. The relator complied with this order for the support of his child rather indifferently, and as a result he was arrested at the instance of the Humane Society, upon the affidavit of his former wife, and committed to the city workhouse.
Relator claimed that his failure to fully comply with his obligation to support his child was due at times to his inability to obtain employment, and again to the constant efforts of his former wife and the respondent, her mother, to prevent him from seeing his child whenever he called at respondent’s home for that purpose. The latter reason of course furnished no legal excuse for relator’s failure to properly provided for his child. It nevertheless shows to some extent at least, that relator was not bent on entirely neglecting his child, and that he still had considerable love and affection for the child, but like many other laymen, when placed in similar circumstances, he felt that if he could not see his son he should not be compelled to pay money to those who were depriving him of this right.
*122 After she obtained her divorce from relator, his former wife lived with the child Robert, in the home of her mother, until May, 1916, when she was married to one Joseph Fisher, and thereupon she left the home of her mother,- and with the child took up her abode in a separate home with her husband Fisher.
In March, 1918, the relator enlisted in the army, and while in the service he claims to have made provision by allotment for the support of his son. He was honorably discharged from the service in January, 1919, and returned to Cincinnati.
In the meantime, while the relator was in the army, his former wife died, on August 31, 1918, and upon her death the respondent took the child into her custody and control. The relator commenced this proceeding on February 8, 1919, shortly after he returned home, and learned of the death of his former wife.
The respondent claims that the relator has no legal or moral right to the'custody of the child, for the following reasons:
First: Because he abandoned the child and the child has become a stranger to him.
Second: Because he is not a fit or suitable person to be entrusted with the care and education of his child.
Third: Because the child has become greatly attached to the respondent, in whose home he has lived most of his life.
In discussing the law to be applied in determining this controversy, counsel for the respondent contend in their brief, “that the polar star of the legal question is, and always was and always will be, the welfare of the child.”
This contention is undoubtedly entitled to very serious consideration; but if we may continue the metaphor, it must also be remarked that when courts turn their legal telescopes to study the firmament for light and guidance in cases of this character, they immediately observe the presence of another luminary, slightly less brilliant perhaps than the “polar star” just mentioned, but one nevertheless which can and does throw out many useful and helpful rays, and whose existence can not and should not be denied.
This second stellar body may be designated the “rights of the parents.” It is universally■ recognized by the courts that pa *123 rents have the natural right to the custody and control of their children, and in case of the death of one parent, the surviving parent has the prima facie right to this custody and control.
It is also recognized however, that this inherent natural right of the parents with respect to the conrol and custody of their children is not an absolute right, but is subject to judicial control whenever the safety, welfare or interest of the child demand it, and must yield whenever the real and permanent welfare of the child requires a different disposition.
Natural rights are not conferred by constitution or statutes, but they are expressly guaranteed by them, and thus become a part of the civil law and are commonly referred to as legal rights. Such rights the state may regulate and control, but such power of modification or control on the part of the state should always be exercised within the limits which are fixed by the purposes of society.
It is self-evident that if the rights of parents are to be entirely subordinated to the welfare of their children in determining this question of custody and control, few families would be safe from the danger of involuntary disintegration through the application of such a rule.
It is clear therefore, that the welfare of the child must be and is a relative and not an absolute consideration.
In Stapleton v. Poynter, 111 Ky., 264, the court say:
“While the welfare of the child is to be considered in' determining who is to have its custody, the legal right of the parent should also have weight, and therefore, the widowed mother of a boy nine years old is entitled to his possession as against his paternal grandparents with whom he has lived for several years, though they have fortune, character, kindliness and affection for the child, and though he prefers to remain with them, the mother being a person of moral habits, without contagious or infectious diseases, and of enough industry to reasonably assure the child from want.”
Again, on page 268 in the same case, we find the following language used by the court:
“Nowhere has it been held, so far as we are aware, that a parent, however indigent, ignorant or even vicious, can be deprived *124 by law of the custody of bis child at the suit of a stranger, however charitably disposed and prepared he may be to give the child the advantage of coveted opportunities for its moral or intellectual development. ’ ’
In Dunkin v. Seifer, 123 Ia., 64, the syllabus is as follows:
“The fact that a parent is less able than another to provide for his children will not support a claim of adoption where it appears that he has not abandoned this custody, is able to give it a decent support, and is morally fit to have it in charge. ’ ’
There are numerous authorities to the effect that between persons who do not claim custody with equal right, the welfare, position or moral worth of the person or persons opposing the claim of the parent are entitled to slight consideration.
In Clark v. Bayer, 32 O. S., 299, syllabus 1 is as follows:
' “As a general rule the parents are entitled to the custody of their minor children. When they are living apart, the father is prima facie entitled to have custody, and when he is a suitable person, able and willing to support and care for them, his right is paramount to that of all other persons except that of the mother in cases where the infant child is of such tender years as to require her personal care; but in all eases of controverted right co custody the welfare of the minor child is first to be considered. ’ ’
In re Coons, 20 O. S. C., 47, syllabus 4 reads as follows:
“In-a controversy for the custody of the child, the paramount object which governs the court is the benefit of the child, and all rights must yield to that.
“5. But when all else is equal, and no present reason exists for departure from the rule, the right of the father to the custody of his minor child is superior to that of any other person.”
It is claimed by the respondent that the relator abandoned his child when the child was a mere infant, and for this reason he should not now be permitted to resume its custody and control.
It appears from the evidence that the former wife of relator, who was the mother of the child, obtained a divorce from relator shortly after the child was born, on the ground of gross neglect, and that prior to the commericement of the divorce proceeding *125 the relator left his home, which was likewise the home of his mother-in-law, the respondent here. What caused relator to thus leave his home does not appear. It is true that he supported his child very indifferently after the divorce, but it can not be said in the absence of any evidence on this point, that his departure from his home and his subsequent indifference to the welfare of his child were prompted by any desire to abandon, the child, or by any lack of affection for the child, or interest in its future welfare.
Manifestly, the relator was not welcome in the home of his former wife and mother-in-law after the divorce, and consequently he did not intrude himself upon them. That they cared nothing for him, and were determined to wholly alienate the child from him, and blot out of the child’s memory any recollection of the father, is apparent from the fact that upon the. second marriage of the child’s mother the father’s name was abandoned and the child became known in the neighborhood of his home and at school by the name of Fisher, which was the name of the second husband. This was not only an injustice to the father, but to the child as well. Under the circumstances of this case, there was positively no justification for depriving the child of its true and correct name.
It must further be borne in mind that the relator has never by any agreement relinquished his right to the custody of his child, nor has he acquiesced in the assumed custody of the respondent.
The decree entered in the divorce proceeding between the relator and his wife gave the custody to the wife, where in law it exclusively remained up to the time of the wife’s second marriage, and thereafter until the wife’s death. It was only upon the death of the child’s mother, in August, 1918, that the respondent became the sole custodian. For more than two years prior to her death, the mother of the child, together with her second husband, and the child, lived in their own home, apart from the respondent, so that during this time at least the child was not even in the partial custody of the respondent.
The respondent took the child upon the death of the mother, while the relator was in the army, but immediately upon his *126 return to civilian life the relator, upon learning of the death of his former wife, instituted this proceeding. He was guilty of no laches. He began at once to contest the right of the respondent to retain the custody of his child, whom she had had for a period of less than six months because of the relator’s service in the army.
The mere fact that for the first four or five years of the child’s life the respondent lived under the same roof with the child, and its legal custodian, does not justify the assumption that during this time the respondent was the child’s custodian. This was a mere circumstance, which is entitled to little if any weight in determining the question of the present right of custody. Such considerations are sentimental, rather than legal.
We now come to the question of the fitness of the relator to assume the custody and control of his child. The respondent claims that he is not a fit or suitable person to be entrusted with the care and education of his child. What is the evidence in support of this claim?
At the time the matter was heard, the relator had just returned to the city after being honorably discharged from the army. He was making his home with his parents who appeared in court in his behalf, and who appear to be, and unquestionably are, persons of the highest respectability. In the home of such parents, there certainly exists no environment that could jeopardize the child’s present or future welfare, and both are eager to have the little grandchild brought into their home.
Before he entered the army, the relator was earning about $90 per month, and testified that he could earn that much and probably more as soon as he got back to work again. Such earning power would easily enable him to properly take care of his child.
There was some testimony at the hearing to the effect that while the relator and his wife were living together the relator was almost continually in a condition of financial embarrassment; that he did not always pay his debts, and that he borrowed money from the respondent. Financial embarrassment is not a crime, nor is it even a fault in many instances. Among young peopln especially those who have just entered the nuptial state, sickness *127 poor management, or small earning capacity not infrequent;; brings about financial distress in a newly established home.
It may also be true and there is some evidence to the effect that the relator at times indulged in pasttimes not conducive to thrift, such as betting on race horses, and the like, and that he was guilty of slight indiscretions with- respect to the use of money, which did not make for his financial betterment.
We shall not however, attempt to determine whether or not this conduct or these habits in any way affected the relator’s fitness to take charge of his child. .All these things occurred, if at all, five or six years ago, and unless the relator is shown’ to be an unsuitable person at the present time to have the custody and control of his child, the fact, if it is a fact, that at some time in the past his conduct or habits may have been such as to make him unsuitable or unworthy, furnish no legal reason for withholding from him this parental right now.
By an almost unbroken line of decisions, extending through the entire body of English and American law, this principle has been repeatedly confirmed.
In re Deming, 10 Johns, N. Y., 232, the court held that the father of certain children, who had been convicted of a felony, and sent to prison for life, was not, for this reason alone, rendered unfit to have the custody and control of his children, upon being pardoned and restored to full citizenship.
In the matter of Rabourg, 3 N. Y., 323, the court indicated that the fact that the father had been a confirmed drunkard and subject to attacks of delirium tremens would not militate against his parental rights with respect to his children, in the face of his satisfactory proof that at the time of the hearing he had completely reformed.
Courts have undoubtedly, and in the main very properly, refused to permit parents to have the custody and control of their children when at the time of the application for such a right it is shown that because of the immorality, viciousness, intemperance, criminal propensities or general unfitness of the parent seeking the custody it would be dangerous and detrimental to the child’s welfare to place it in the care of such a parent. *128 But there is no evidence of the existence of such conditions here, and there is therefore no necessity for further discussion on this point.
It is argued however, with much force by counsel for respondent, that because of the great love and affection that exists between the child and the respondent for each other, the child should not be taken from the custody and control of the respondent. That this love and affection exist is indisputable. Nor will any attempt be made to question the ability of the respondent to give the child a proper home, or her fitness and suitability to rear the child in environments that would be free from any menace to the child’s welfare.
During the time that the child was in the custody and control of the respondent, she has unquestionably done everything within the limits of her means to provide for the child’s comfort and welfare, and would undoubtedly continue to do so in the future if the child remained with her.
But, loath as the court is to interfere with this relationship, it is inevitable that under the law and the facts of this case it must be done, for the rights of the relator in this case are paramount to those of the respondent, and the recognition of them can not and does not jeopardize the interests of the child.
The petition of the relator is therefore granted, and the care, custody and control of the child awarded to the relator, to commence on the first day of August next, and as indicated in the Coons case supra, “in the meantime every facility must be given the child to become better acquainted with its father, and opportunity that its affection may go out to him, and that the child may be apprized and prepared as well as may be for this change of custodians.”
There must also be given to the respondent, Evelyn Y. Stroud, the grandmother of the child, opportunities to see and visit the child at suitable and proper times, so that the transfer of the custody of the child from the grandmother to the father may be brought about and maintained under conditions least calculated to excite or grieve the child. ''