## Creech v. Lewis.

May 11, 1948.

Rehearing denied June 25, 1948.

J. K. Beasley and M. F. Hall for appellant.

Astor Hogg for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellant, who was Peggy Ann Warf, was married in 1943 to James Creech, a son of appellee. The girl child, who is the subject of controversy, was born in June 1944, at a time when the husband was in the Army, and who is still in service in Germany. About one year after the birth of the child Peggy Ann secured a divorce from James Creech. It appears that the child's custody was not determined in the divorce judgment, but following the divorce the child and mother remained with the

family of appellant's mother, Mrs. Eula Warf, until December 1947 when under some court proceeding between Mrs. Lewis and Mrs. Warf (maternal grandmother) the court awarded custody to Mrs. Lewis. We take it that the move on Mrs. Lewis' part was occasioned by the fact that Peggy Ann had theretofore signed a paper in which she released the custody of the child Phyllis to Mrs. Lewis "to be cared for and educated according to her ability and standing in life" with right of visitation by the mother at intervals. This paper was signed in April 1946.

It is not clear that Mrs. Lewis took custody of Phyllis upon execution of the paper, but it seems that following its execution Peggy Ann went to Baltimore to work, but returned to her mother's home in Cumberland in the early part of December 1947, upon hearing of the litigation between the grandparents under which custody was awarded to Mrs. Lewis.

In explanation of the execution of the contract mentioned appellant said when it was made she was about 17 or 18 years of age; she was working and her mother and father had gone to Virginia, and she asked Mrs. Lewis to take care of the baby over the week-end, and she said she would not unless appellant signed a writing saying "I would let her take care of the baby." She testified that she did not read the paper and was under the belief that the custody was only temporary, and she did not intend to release the child forever. The record shows that the father of Phyllis makes a monthly allotment of $42 for the child; each contesting side asserting that the handling of this money is the real casus belli, not a far-fetched assumption.

On December 30, 1947, appellant obtained a writ of habeas corpus in the quarterly court, which was returned to the circuit court. In her petition she alleged some of the foregoing facts, and plead that she being the mother of the child was legally entitled to its custody; that the defendants Mrs. Lewis and her husband were not suitable persons to have her custody; that the home where the family lived (at Sand Hill) was an immoral home, setting out specific instances of law violations. She stated that she was amply able to work and support the infant, and that she has a good home with

her parents, who have a good income. She said that appellee was an elderly woman, and unable to give the child proper attention and care. The response of defendants was merely a denial, and affirmative assertion that they have a good home and are properly caring for the child and her best interest will be served by their retention of control, and that appellant is an unfit person to have her custody.

At the hearing more than 25 witnesses testified, and from much of the testimony it may be said that considerable ill-feeling existed between the parties. At the conclusion the court dismissed the writ. In his memorandum opinion, made part of the record, the court aptly and correctly refers to the matter as "one of those unfortunate cases where the grandparents on one side and the parent on the other have a controversy over custody of this child." He referred to the case of last December when the child was turned over to Mrs. Lewis. The court stated the rule to be that ordinarily the parent of a young child is entitled to its custody as against the grandparent "unless the parent has made an agreement to turn the child over to its grandparent, and this is one of those cases, and an exception to the rule." The court expressed the view that "both sides are good families and I think perhaps the child would be in good hands of the grandparents." He said "the mother had no settled place to board, at any rate she has been in Baltimore for quite a while and her parents have had the care of the child, but before she went up there in April she made this arrangement and turned over the child to them, and though she is a minor she is the mother of the child."

It seems that the court gave more consideration to the effect of the agreement than to what would be to the best interest of the child, though he did conclude that the child would be in good care with the grandparents; we may take this to mean both the grandparents on paternal and maternal sides; we further gather that it was the expressed intention of appellant to remain in Cumberland with her parents, who seem to be able and willing to accept such an arrangement.

It would serve no great purpose to detail the testimony of the numerous witnesses pro and con. The

proof does not show an eminently satisfactory situation on either side, and, as in many of such cases, this court is confronted with a difficult problem in reaching a conclusion as to what appears to be the best welfare of this child, who will soon be four years of age.

Some dozen or more witnesses testified for the mother and about an equal number for the grandparent, and we are to undertake the striking of a balance from what is presented for our consideration. The witnesses, aside from the two parties, were members of the families, or friends and neighbors, with some who were apparently disinterested.

From appellant's testimony we gather that the Warfs (parents of appellant) have a good home at Cumberland. The father and one brother of appellant are coal miners and say they average wages at around $350 per month, and appear to be willing to assist in the care and upkeep of the child. Appellee, about 44 years of age, owns and operates a grocery store at Sand Hill, the store being located on a highway. The family, appellee and her husband, to whom she has been married about 5 years, have living quarters in the store building, consisting of a sitting room, one bedroom, kitchen and bath.

A number of witnesses said that the general reputation for morality of the Lewis family was bad. It was testified that Mr. Lewis had served a term in Atlanta for violation of the liquor laws, and also a short jail sentence for a like violation. These charges were admitted, though with what to him appeared reasonable excuses. It was also shown that a son of Mrs. Lewis and two stepsons had prison records, though she says they strayed from proper paths after she had lost control of them. It was shown that Mrs. Lewis had had trouble with neighbors, one the family of Scotts, which resulted in a shooting out of her store windows while Scott was shooting at her, and also in having Mrs. Lewis placed under a peace bond. She had a fight with another neighbor striking her on the head with a bottle. There was proof that the Lewis folks had a reputation for bootlegging. There had been several raids on the store or home, but nothing of incriminating nature was found. There was a bit of evidence by the mother of Peggy

Ann that Burl Lewis took the child to his home for a few days, and when she returned to the Warf home she told Mrs. Warf that Burlie had mistreated her, and an examination of the child showed some evidence of undue fondling, though not serious. This was denied by Mr. Lewis.

There was evidence that the child had not been well treated, properly clothed or had proper medical attention while at the Lewis home; that after she remained there for a while her disposition changed much for the worse. She seemed cowed and afraid, and unfriendly with the mother. Several witnesses testified that since the Lewis store was a public place, immediately on the highway, the Warf home would be the most suitable, at least the safer place for her to live.

Mrs. Lewis testified and introduced a number of her neighbors, and others. She admitted the trouble and peace bond charges, but denied having ever been engaged in illicit liquor traffic, and admitted the prison charges relative to her husband, son and stepsons. She said she had a good home and was anxious to keep, and was able to provide for, the child. She owns the store building and said it was worth $30,000, but did not know her income from the grocery business. It was not shown that the husband was occupied in any trade or business. She made it appear that the care and attention of the child was superior to that given by appellant's parents, though there was little or no proof as to the moral qualities of Mrs. Warf, except it was said that on one occasion this grandmother had been seen at a night club dancing and perhaps drinking. This she denied, saying that on that occasion she, her daughter and the child went into one of the night clubs and obtained soft drinks and immediately left. Mrs. Lewis intimated that the $42 sent by her son each month was the cause of the interest manifested by the mother and her parents. In response to this, the suggestion is made that Mrs. Lewis, when the child was born, was disappointed because it was a girl, and later manifested no appreciable interest until the allotment was made. Mrs. Lewis said Peggy Ann had a bad general reputation; that when she came to her home and took the child, after she had been given the custody, she used indecent language in the child's presence. This the mother denied, but said that

at the time she was mad and may have said something which she should not have said.

About the only thing said detrimental to the Warf home was that the old man cursed and "they had empty bottles and were making home brew." Other testimony more specific in nature, was to the effect that Peggy Ann had been seen on several occasions at the Star Night Club and the Casina, at these times drinking and dancing, and sometimes well under the influence of liquor. She had been seen at another time near Cliff House near an automobile and intoxicated, at another time at the Park Hotel with "another man" and drinking.

Peggy Ann denies having been at any of these places, except on the one occasion; she said she was at the Park Hotel, but nothing out of the ordinary occurred, and she was in company of a friend and his wife. She admitted that she and her mother and child did go to one of the club houses, but just for a short while, when nothing more than soft drinks were taken. It may be noted that on cross examination of the witnesses who testified as to specific instances of her departure from the proper path, they said that these instances, or most of them, were remote in time and apparently before the child was born. The foregoing in a general way is the trend of the testimony.

Appellant insists that the proof as a whole shows that the situation in the Lewis home is not any too savory, and that the Warf home is by far the better place for the child to live, and that she is much better fitted to give the child the attention and care she is entitled to have. She also contends that under the Statute, KRS 405.020, which provides that parents of the child shall have preference in the matter of custodianship, "if suited to the trust," or unless the parent is shown to be unfit, or the placing of the child's custody elsewhere would better contribute to its welfare. Bard v. Bard, 295 Ky. 254, 173 S. W. 2d 569; this and all our cases hold that the court's chief concern is the welfare of the child. Lewis v. Lewis, 295 Ky. 258, 174 S. W. 2d 294.

On the other hand, appellee insists that under the contract she is entitled to custody, and that the proof shows the mother not to be a proper person to have cus-

tody of the daughter, and on the question of effect of the contract cites cases wherein we have held that such are not illegal or contrary to public policy. On the other hand appellant insists that the contract is void because at the time of its making she was a minor and could not legally contract, pointing to our opinion in Stapleton v. Poynter, 111 Ky. 264, 62 S. W. 730, 53 L. R. A. 784, 98 Am. St. Rep. 411, in which we held that such a contract made when the mother was under the disability of coverture was totally void, as far as the mother's rights were concerned, and apparently placing it in the same category with a contract by an infant.

We went over this and many previous cases involving the effect of similar contracts, in most of which the question of legal disability was not involved; in Thompson v. Childers, 231 Ky. 179, 21 S. W. 2d 247, in which we pointed out that the courts of various jurisdictions were not in agreement as to the validity of contracts of this sort, but concluded that Kentucky had aligned itself with those jurisdictions in which it had been held that such a contract was not contrary to public policy, but may have binding effect only so long as the person holding custody under agreement performs the duties which should be performed by the parent. In other words, if the facts and circumstances are such that show that the welfare of the child would be best conserved elsewhere, the contract may be repudiated, when it has been executed by one though not laboring under any legal disability, a rule recognized in Lewis v. Lewis, 295 Ky. 258, 174 S. W. 2d 294, and Fraze v. Grundy, 300 Ky. 613, 189 S. W. 2d 265; Bard v. Bard, 295 Ky. 254, 173 S. W. 2d 569.

Without prolonging this opinion we may say that we do not give great weight to the alleged contract, made under circumstances which make the purpose and intent doubtful, and turn to consideration of the court's paramount duty in cases of this character, that is, do what seems best for the welfare of the child in question, regardless of who now, or under what right the person has the custody.

There may be here presented equal balance as to the ability of the contending parties, with the favor, perhaps, as far as financial ability is concerned with

the present custodian, but on the question of moral fitness or unfitness the scale must turn in favor of the natural mother, and if she carries out her expressed intention to keep the child with her parents, much in their favor. In reading the record we are not much impressed with any particular expression of that love and devotion which grows up between grandparents and grandchild as to cause us to, on the part of appellee, give that situation great weight. There is less showing of any degree of affection on the part of the husband of appellee, who is not of the same blood, and who only says if Phyllis be left in appellee's custody he would do the best he could toward the child's support. A careful survey of the proof manifests that the best welfare of the child would not be conserved by leaving it in the home of appellee.

Ordinarily we hesitate to run counter to the conclusion of the chancellor, or the court who heard the evidence and had opportunity to see the witnesses, but as here where apparently the chancellor gave too much weight to the contract and not enough to the interest of the child, plus the mother's natural right, we feel compelled to reverse the judgment with direction to sustain the writ.

Judgment reversed.