CRASE et ux. v. SHEPHERD et ux.

Court of Appeals of Kentucky.

June 8, 1951.

Napier & Napier, Hazard, for appellant.

Wm. Melton and W. E. Faulkner, Hazard, for appellee.

CULLEN, Commissioner.

In a habeas corpus proceeding in the Perry Circuit Court, the natural parents of J. C. Shepherd, a five-year-old boy, sought to recover his custody from foster parents in whose home the child had been living for several years. The circuit court entered judgment awarding custody to the natural parents, but permitted the foster parents, upon executing a supersedeas bond, to retain custody pending the appeal which they have taken to this Court.

The natural parents are around 40 years of age. They have several children, including the child in question. The oldest child is a girl 17 years of age and the youngest child, who is the one involved in this action, is now five years of age. Some time in the spring of 1946 the house in which the natural parents and their family were living was destroyed by fire. About two months later the mother became so mentally ill as to require that she be sent to the state hospital. At that time the child in question was nine months old. When the mother was sent to the state hospital, her married sister took the baby for a short time. The foster mother in this case, Mrs. Ethel Crase, saw the baby in the home of the maternal aunt, and after talking it over with her husband they decided to take the child. There is some dispute as to whether the maternal aunt surrendered the child to the foster parents because she was ill and unable to care for the child, or merely because the foster parents offered to take the child. It is clear, however, that neither of the natural parents had any conversation at that time with the foster parents, or made any statement as to their intentions concerning the child.

The natural mother remained in the state hospital two or three months, and then returned to her home. Upon her return, the natural parents asked for the return of the baby, and the foster parents surrendered the child to them. The mother remained at home only for two or three months, and then was sent back to the state hospital. The baby then was brought back to the foster parents, and again there was no conversation between the natural parents and the foster parents as to the ultimate disposition of the child. The foster mother testified on cross examination that when the child was delivered to her she promised that she would give the child back to the natural mother when she returned from the hospital, if she was able to take care of it. It is not clear whether this was the first or second time the child was delivered to the foster parents. There is evidence that the natural father sent the child's birth certificate to the foster parents, and some neighbors testify as to statements made to them by the natural father that he wanted the foster parents to keep the child and then adopt it.

After the natural mother was returned to the state hospital she remained there for approximately two years. Upon being released, she went to her mother's home in Perry County and she remained there until one week before the habeas corpus proceeding was begun. After returning to her mother's home, the natural mother still was suffering from a mental condition, and she was kept confined for six or seven months. However, her relatives testify that she has greatly improved and now is in good health and good mental condition, except for worrying about the child. There is considerable testimony that her worry about not having the child is the only thing keeping the mother from making a full recovery, mentally.

During the two years when the natural mother was living at her mother's home, the father and most of the children were living in Harlan County, where the father was intermittently employed as a coal loader. In that two-year period, the father visited the mother only once.

During the period of more than four years that the child in question was in the home of the foster parents, the natural father visited the child only twice, and

then only for a brief moment each time. He did not contribute anything towards the support of the child, or send the child any gifts.

Approximately one week before the habeas corpus procceding was commenced, the natural father found a one-room house near Leatherwood in Perry County, and brought his wife there from her mother's home, so that, except for the child in question, the family was all together for the first time in more than four years.

The house in which the natural parents are living is a one-room cabin made of railroad ties. It has only a few sticks of furniture, including three beds, and no plumbing. It appears that the house has window spaces, but no panes. The father, at the time of the hearing, was not working at any employment, but he testified that he had the promise of a job at a mine some distance away. However, he was unable to give the name of the mine or of his employer.

There was evidence that the older children of the natural parents had not been sent to school, were poorly clothed, and were not kept clean.

The foster parents live in a comfortable four-room house, owned by the Blue Diamond Coal Company, by which the foster father has been employed for seven years as a bull dozer operator. The house has modern conveniences, and is well furnished. The foster father does not seem to have accumulated any property, but his income is around $5,000 per year. The foster parents have two sons of their own, one fourteen and the other sixteen years of age. At the time of the trial, the older boy had gone to Michigan to obtain a job. To the detriment of the foster parents, it must be said that they have neglected the education of their two sons, because the younger boy has not gone to school, and the older boy went only to the sixth grade. However, their home is near a school, and both of the foster parents assert their intention to send the foster child to school.

The foster parents both testified to their love and affection for the child, their wish to adopt him, and their intention that he should share equally with their natural sons.

The child, upon being questioned at the hearing, identified the foster parents as his father and mother, and gave affirmative answers to questions as to whether they were good to him, whether he loved them, and whether he wanted to stay with them.

Neighbors of the foster parents testified as to the care and affection bestowed by them upon the child, and as to the neat and clean condition of the home.

Upon the facts hereinbefore related, we must determine whether the trial court made a correct decision on the question of custody of the child.

It must be stated at the outset that the foster parents have failed to establish a contractual or other voluntary relinquishment of parental rights by the natural parents of this child. A contract for surrender of parental rights must be established by clear and convincing evidence. Estridge v. Taylor, 310 Ky. 684, 221 S.W. 2d 644; Lewis v. Lewis, 295 Ky. 258, 174 S.W.2d 294. And such a contract will not be upheld, even if established by sufficient evidence, where the surrender of parental rights was made in circumstances of temporary distress or discouragement. Estridge v. Taylor, supra; Ferguson v. Klein, 273 Ky. 473, 116 S.W.2d 950.

There being no basis for finding a surrender of parental rights, it is clear that the natural parents have a superior right of custody, which must prevail unless they are not suitable, fit or capable of making reasonably adequate provisions for the child's well-being. Rallihan v. Motschmann, 179 Ky. 180, 200 S.W. 358; Green v. Kennedy, 304 Ky. 796, 202 S.W.2d 609.

The question of what factors enter into a determination of suitability and fitness was discussed at length in Cummins v. Bird, 230 Ky. 296, 19 S.W.2d 959, 960. In that case, Judge Willis, speaking for the court said: "* * * It will be seen that the statute does not confer upon the parent an absolute right, but conditions the custody of infant children upon the

suitability of the particular parent to the discharge of the duties of the trust. The welfare of the child, consistently with legal responsibilities, is the controlling consideration in determining its custody, or the suitability of a claimant for the trust. Bedford v. Hamilton, 153 Ky. 429, 155 S. W. 1128. The term 'suited to the trust,' as used in the statute, is an elastic one, and it must be understood and applied in the light of the facts and circumstances of each particular case. It involves a consideration of every element entering into the problem, and a contemplation of all the factors that may affect the welfare and happiness of the infant whose interests are involved. Moore v. Smith, 228 Ky. 286, 14 S.W.2d 1072. The judicial inquiry is not confined or limited to the moral character and financial ability of the particular parent that may be asserting a right to the custody of his child. It comprehends a proper consideration of those essential elements of the problem, but, in addition thereto, it requires due weight to be given to all other facts and factors that have a bearing on the complex and responsible duty of rearing, training, and fostering a child according to its potential capacity and consistently with its individual character and needs."

In Rallihan v. Motschmann, 179 Ky. 180, 200 S.W. 358, 362, this Court said: "In determining his suitability the court will take into consideration his moral fitness and habits, surroundings, age, financial ability, interest, and affection for the child, and any circumstances which would be prejudicial to the best interests of the child, including the breaking up of her present relations, but the burden of showing his want of suitability is cast upon the one who would deny to him the custody of his child upon that ground."

Applying the tests of suitability and fitness defined in the Cummins and Rallihan cases, we find that the natural parents fail in many respects to meet the tests. In applying the test of happiness of the child, we find that we have a child who has lived, as long as he remembers, with the foster parents; who believes that the foster parents are his parents; whose associations, friendships and experiences are identified only with the home in which he has lived since a baby. Applying the test of surroundings, we find that the home of the natural parents is a one-room cabin, poorly furnished, in an isolated neighborhood, with little in the way of the conveniences people associate with the comforts of life. Applying the test of financial ability, we find that the earning capacity of the natural father is low, and that he has no reasonable prospects of supplying anything beyond the bare necessities for his wife and seven children. Applying the test of interest and affection, we find that the natural father showed little or no interest in or affection for the child during the period of almost five years when the child was with the foster parents; that while the natural mother clearly has the love and affection of any mother for a child to whom she has given birth, yet this love and affection, admittedly through no fault of the mother, has had no opportunity to be tested through daily contact with the child as an individual with personality and character that have developed since the mother last knew the child as a nine-month-old infant. Applying the test of breaking up the child's present relations, we find that to award custody to the natural parents would be a violent experience in the life of this child, requiring him to undergo a period of adjustment during which he would need exceptional love, understanding and intelligent guidance.

The individual tests of suitability and fitness all are addressed to the basic question of whether the parents are capable of bearing the complex and responsible duty of rearing, training and fostering this child according to his potential capacity and consistently with his individual character and needs.

There are two facts in this case that seem predominant on the question of suitability and fitness of the natural parents. The first is that during the period of the mother's incapacity and separation from the family, the father evidenced no interest in having the custody of the child, from which it may be assumed that the father is either unwilling or incapable of assum-

ing responsibility alone for the welfare of the child. The second fact is that the mother, at the time of the hearing, had been back with her family for only one week. Having undergone a prolonged experience of mental illness, during which she was not faced with the tremendous responsibility of the mother and homemaker of a large family, she has bravely undertaken again that responsibility. In view of her history of mental illness, we believe there may be a question as to whether she will prove capable of providing a normal home life for her family. Until her capability has been proved by the experience of a reasonable period of time, we feel that the child should not become a part of the already large family for which she must care.

In view of the facts that the foster parents have provided the child with love, affection and care during the most impressionable period of his life; that their home is neat, clean, and well furnished; that the foster father has a good income; that the child is established and happy in their home; and that the natural parents, for the reasons indicated in this opinion, fail to meet adequately the required tests of suitability and fitness, we are of the opinion that the trial court erred in awarding custody to the natural parents.

The judgment is reversed.