Faye MANION, Appellant,

v.

Virginia COFER, Appellee.

Court of Appeals of Kentucky.

Oct. 2, 1970.

As Modified On Denial of Rehearing
Nov. 20, 1970.

------◆------

Paul M. Lewis, Hatcher & Lewis, John L. Arnett, Faurest, Collier, Arnett, Hensley & Coleman, Elizabethtown, for appellant.

Floyd K. Hollan, Elizabethtown, for appellee.

PALMORE, Judge.

Faye Manion, stepmother of Shelby Dean Manion, a 9-year-old girl, appeals from a judgment transferring custody of the child to its mother, Virginia Cofer (formerly Manion). For convenience we shall call the parties by their first names.

Shelby Dean is the daughter of Virginia and the late James Manion. Virginia obtained a divorce from James in 1965, after which he married Faye and she married a man named Cofer. James was accidentally drowned in 1969, and Faye is now an unmarried widow. Virginia resides with her husband, Cofer, in New Albany, Indiana.

At the time of their divorce in 1965 Virginia and James had three infant children, Shelby Dean being the middle one. James did not contest the divorce suit, and entered into a written contract under which Virginia was to have custody of all three children subject to reasonable visitation. In granting the divorce to Virginia, the trial court (the late Laurence Grauman, sitting as special judge) approved the contract "with the exception that Shelby Dean Manion * * * be and she is adjudged in the custody of defendant * * *". Faye says the reason for this modification was that Shelby Dean had been beaten while in the custody of Virginia and Cofer (who had begun living together before the divorce), but there is nothing in the record of the divorce proceeding to verify it and Virginia says she does not know why the change was made. Anyway, shortly thereafter James married Faye and, pursuant to the judgment, Shelby Dean lived with them in Hardin County until James' death 3½ years later and continued to live with Faye until the judgment in this proceeding took effect. As of the present time, presumably, she has been with Virginia since about the first of March, 1970.

Faye owns and occupies a 5-bedroom home in the country near Elizabethtown. Also living in the home are her twin daughters two years older than Shelby Dean, an 18-year-old daughter, and Faye's stepfather. Faye testified that she has a $9,000 savings account and a "trust account" of between $4,000 and $5,000. The stepfather is financially well off and contributes to the support of the family as needed. Faye has an income of some $290 per month, a substantial portion of which apparently comes in the form of support payments for her own children. She expects also to draw Social Security benefits as the result of James' death. She is a licensed cosmetologist (beautician) but is temporarily unable to resume her professional work by reason of the fact that she must have a surgical operation to repair an abdominal condition resulting from a gunshot wound.

The only evidence relating to Faye's injury consists of her own explanation that

"they tell me it was an accidental gunshot wound." However, in his memorandum opinion the chancellor elaborated upon it as follows:

"Around the middle of May, 1969, Faye was in an automobile on North Miles Street in Elizabethtown seated on the front seat behind the steering wheel. Also in the automobile were her children, Stephen Fryrear, Juanita Fryrear, Janita Fryrear, Rosella McLane, her stepfather Marshall Fryrear, and her stepdaughter Shelby Dean Manion. On this occasion and with all these persons in the automobile, Faye shot herself in the abdomen with a pistol, apparently in an effort to take her own life. Although the proof does not develop all these facts, they are of common knowledge in this community and are verified by Shelby Dean Manion, with whom this court discussed this case at the suggestion of Faye's attorney.

"Faye was immediately confined to a hospital and while still a patient there due to her self inflicted wound, and on June 21, 1969, her husband, James Manion, and her son Stephen Fryrear were both accidentally drowned while on an outing * * * Faye's inclination toward instability cannot be overlooked. When she attempted to take her life, the projectile from the pistol could have easily injured or killed one or more of the children who were in the automobile at the time."

Faye made a forthright and sensible witness. If she is emotionally unstable it is not discernible in her testimony and cannot be inferred from the testimony of any other witness on either side. Preachers, teachers and neighbors testified that the child was happy and well-adjusted and had a good and healthy relationship with Faye and the other children. In a private audience with the chancellor she expressed the desire to remain with Faye, and the chancellor noted that she did not appear to have been coached or prompted.

Virginia and her husband live in a ground floor apartment consisting of four rooms, a "utility room" and bath. They have two children of their own plus Shelby Dean's two siblings, and because they both work it is necessary for them to have a full-time babysitter (an adult), who also lives in the apartment, making a total of eight people including Shelby Dean. By contrast, Shelby Dean had a private bedroom in Faye's home. Whether Virginia contemplated moving to more spacious quarters in the near future she did not say. Her husband did not testify. Apparently Virginia made no effort to visit Shelby Dean during the four years or so she lived with Faye.

▪ There was no evidence, and the chancellor did not find, that Faye is unfit to continue as custodian for Shelby Dean. We agree with Faye's counsel that it certainly was not proper for the chancellor to consider the apocryphal information he had with respect to the gunshot incident. Nevertheless, it is clear from the memorandum opinion that the basis for his judgment was that Faye had the burden of proving Virginia's unfitness and did not sustain it. If Faye did have the burden of proof the judgment is correct, because the evidence does not require a finding that Virginia is unfit.

▪ There is an abundance of authority for the proposition that in a child custody contest between a natural parent and a non-parent the non-parent must prove the parent's unfitness in order to prevail. See James v. James, Ky., 457 S.W.2d 261 (decided June 26, 1970), in which it was held "that the natural parent is entitled to the custody of his child unless it is shown that the natural parent (1) is unsuitable to have custody, or (2) is harmful to the child, or (3) has contracted to give his child away, or (4) is clearly estopped to claim custody." The same opinion observes that the rule in such cases has been "indefinite and confusing," and it is this regrettable circumstance that has led to what a majority

of the court feels is an erroneous result in the case now before us.

At the vortex of the problem lies KRS 405.020(1), which provides as follows: "The father and mother shall have the joint custody, nurture and education of their minor children. If either of the parents dies, the survivor, if suited to the trust, shall have the custody, nurture and education of the minor children." The principle that the natural parent has the paramount legal right proceeds both from this statute and from the common law, and "the burden of showing his want of suitability is cast upon the one who would deny to him the custody of his child on that ground." Rallihan v. Motschmann, 179 Ky. 180, 200 S.W. 358, 362 (1918). If the matter were left right there, no uncertainty would exist, and there are those who would indeed leave it there. That would, of course, make these cases easy. It would "flatter that longing for certainty and for repose which is in every human mind. But certainty generally is illusion, and repose is not the destiny of man." Holmes, The Path of the Law, 10 Harv.L.Rev. 457 (1897). Some problems are more susceptible of solution by rigid formula than others, but the attempt to reduce to certainty a subject that defies easy captivity is likely to have a reverse effect. Nowhere is this better exemplified than in child custody controversies. As said in Dudgeon v. Dudgeon, Ky., 458 S.W.2d 159 (decided Sept. 25, 1970), "We cannot create cubicles * * * and then in computer-like fashion attempt to cram the fate of innocent children into one cubicle or the other to reach a result."

■ This court has consistently held that the superior right of a surviving parent "is conditioned upon what is best for the welfare of the children." Reynardus v. Garcia, Ky., 437 S.W.2d 740 (1968). This is but another way of saying that whether the parent is "suited to the trust" does not rest solely on his personal qualifications, but depends to a reasonable extent on what is best for the child. In short, both the blood relationship and the welfare of the child are factors of great importance, but neither can obviate consideration of the other. See Horn v. Dreschel, 298 Ky. 427, 183 S.W.2d 22, 25 (1944); Lewis v. Lewis, Ky., 343 S.W.2d 146, 149 (1961).

One of the great unheralded and often overlooked throttling devices of the law is the burden of proof, by which sometimes that which appears to be the law is put out of reach. The doctrine of res ipsa loquitur is an illustration. That one cannot be held liable without negligence is an empty principle to a defendant upon whom is cast the burden of explaining the unknown. And so in the case before us now, that the legal principles shine bright as the noonday sun only deepens the shadows cast by the burden of proof.

Unlike the legal premise itself, the burden of proof is not dictated by the statute, but is a creature of jurisprudence. It represents a judicial policy choice based upon what is thought to be the fairest and best way to reach a just solution. Assignment of the burden of proof to the non-parent is the equivalent of raising a rebuttable presumption in favor of the parent. All other things being reasonably equal, the blood relationship prevails and the parent wins. That is as it should be; hence in that instance the policy choice is sound. In this case, however, we think it is not sound, and the reason we think it is not sound is that when a court of law has adjudged that a parent who would otherwise be entitled to have the custody of a child shall not have it, there is no basis for indulging the presumption which is erected through the device of putting the burden of proof on the other party.

We give no weight to the testimony indicating that the custody of Shelby Dean was denied to Virginia in 1965 because she had been mistreated. No one can give the reason for a judicial decision but the judge who made it. Conversely, however, we can and do presume that it was made for a reason and, in the absence of further enlightenment, that it was a valid reason.

In Reynardus v. Garcia, Ky., 437 S.W. 2d 740 (1969), the parents were separated but not divorced, and by agreement the children were left with the wife. Upon the wife's death the father was held entitled to their custody as against the wife's parents. Unlike this case, there had never been a judicial determination against the husband on the question of custody. In Berry v. Berry, Ky., 386 S.W.2d 951 (1965), a similar case, custody had been awarded to the wife in a divorce proceeding, but the child was less than two years old at the time, and in view of the familiar policy that in the absence of extreme circumstances militating to the contrary the custody of small children should remain with the mother it cannot be assumed that the judgment cast any reflection on the husband. But in this case there can be no doubt. In the face of a written agreement that the three children would remain with Virginia, and into the teeth of that very principle favoring the mother, one of the most learned, experienced and conscientious jurists in the history of this Commonwealth determined that this particular mother should not have the custody of this particular child. True, his letting her keep the other two suggests that he did not regard her as an unfit mother in general, but obviously he was of the opinion that Shelby Dean's welfare lay somewhere else.

■■ And so we reach this conclusion, that when the surviving parent has been deprived of custody by a court of law, in circumstances under which ordinarily such action would not have been taken without a reason pertaining to his or her *fitness*, then in a suit to regain custody he has the burden of proving that the transfer will not be detrimental to the child.

■ In this instance the little girl had spent nearly half of her life with Faye and Faye's children. She was happy, well-adjusted, and had satisfactorily completed three grades in school. The evidence leaves no doubt that she was in a wholesome and healthy environment. It would

not support a finding that a transfer will not have an injurious effect upon her.

The judgment is reversed with directions that the complaint be dismissed and the custody of Shelby Dean Manion be restored to the appellant.

All concur excepting OSBORNE, J., who did not sit.